## Zell *versus* The Commonwealth.

1. In an indictment for murder where a juror is accepted by the prisoner and then stood aside by the Commonwealth, if the facts show no improper motive in standing him aside, the Commonwealth may afterwards peremptorily challenge him.

2. It was contended that the court erred in allowing the Commonwealth to challenge jurors for cause, on account of the answers made by these jurors, without their having been first sworn on their *voire dire*. No request was made that the jury be sworn on their *voire dire*, nor objection made to their examination without, nor exception taken to their challenges for cause. *Held*, that the court did not err.

3. Per TRUNKEY, J.—"We will remark, however, that though it may not be erroneous to omit the oath, unless it be requested to be taken, yet, so far as advised, it is the more general practice, and we think the better one, to examine the juror under his oath."

4. Where an attempt is made to discredit the statement of a witness, evidence is admissible to show that the witness made said statement at another time to other parties to show that the statement is not a fabrication of recent date, and as bearing on the witness's credibility.

5. Where an indictment is for murder by poison, to establish the *corpus delicti* the evidence is sufficient where it fully satisfies the jury of the fact beyond all reasonable doubt.

6. Where the charge was just to the prisoner, and the points fully answered, the court will not be convicted of error for not having instructed on a point which was not presented.

7. Where in capital cases incompetent evidence is received on the faith that it will become competent before the trial closes, and it is not promptly withdrawn from the jury, when it became certain that this condition was not complied with, and the tendency of the evidence is to affect the credibility of an important witness, or to establish the prisoner's guilt, this court will reverse.

February 9th 1880. Before MERCUR, GORDON, PAXSON, TRUNKEY and STERRETT, JJ. SHARSWOOD, C. J., and GREEN, J., absent.

Error to the Court of Oyer and Terminer of *Cumberland county*: Of May Term 1880, No. 88. Certified from the Middle District.

Indictment of Catherine Zell for the murder of Mrs. Mary Kiehl, by poison.

The facts are sufficiently stated in the following summary of the evidence as made by the court below, Herman, P. J., in the charge to the jury.

From the evidence on the part of the Commonwealth, it appears that Mrs. Mary Kiehl, an aged widow lady who resided near the fair ground in Carlisle, died on the night of Friday, the 30th of May 1879. At the time of her death she was 81 years old. She was buried on Sunday afternoon, the 1st of June.

"Some suspicions having been aroused as to the cause of her death, the coroner, on the 6th of June, had her body exhumed, and held an inquest upon it. At the inquest, Dr. Kieffer was

[Zell v. Commonwealth.]

called upon to make a post-mortem examination of the body, which he did. He has been examined as a witness before you, and has detailed in your hearing the manner in which this post-mortem examination was made, and has given, in minute detail, a description of the post-mortem appearances of the body as he found them. He says that, on account of the condition in which he found the stomach and bowels, he could not but feel that this condition was unnatural, and could not have been caused by any disease of which he had any knowledge; that, therefore, in his judgment, it must have been the result of violence, that the subject had certainly taken, he thought, poison in some form; that his own impression was that it was some inorganic poison. He also says that he tied the stomach at both ends so as to preserve its contents, and removed it from the body; he also removed two sections from the small intestines, one about two yards from the stomach, and one lower down, of about nine inches each, and also one section from the colon, about five inches long. He also removed three different sections of the liver, which would have constituted about one-fifth of the entire organ. The portions of the stomach and the intestines which he removed were placed in a clean jar by themselves, and the three sections of the liver into another clean jar by themselves.

"These jars, with their contents, the coroner says, he subsequently placed in the hands of W. F. Horn, a druggist and chemist of this place, for the purpose of making a chemical analysis of the contents. Mr. Horn says he made a chemical analysis of the contents found in the two jars and found arsenic.

"Mrs. Rebecca Reed testifies, that on Tuesday evening, the 27th of May 1879, she came in to see Mrs. Keihl, to cure her of the wild-fire, and that Mrs. Keihl complained of not being so well, saying she had fallen down the cellar stairs and hurt herself; that she, Mrs. Reed, remained a short time after giving her a cure for the wild-fire, then came in to attend the evening market, and after market returned to Mrs. Keihl's house; that when returning, and she came near to the house, she met Mrs. Zell, the prisoner, coming away from the house with a little tin cup in her hands, and that Mrs. Zell said she had just been up to Mrs. Keihl's, and had taken her some beef and coffee and crackers, and that Mrs. Zell should go along back and show her how she had cleaned Mrs. Keihl's house; that they went back, and Mrs. Zell showed how she had cleaned Mrs. Keihl's house; that both went back to the dining-room; and she showed Mrs. Keihl's front room; and that after some conversation about Wynkoop, Mrs. Zell went home. Mrs. Reed says she went home, and on Wednesday, the 28th day of May, at 4 o'clock, she came in town to attend the morning market, and after market, returned to Mrs. Keihl's house between 8 and 9 o'clock; that when she got back to the house, a

[Zell *v.* Commonwealth.]

pot of coffee, which is before you, was standing on the stove, and breakfast was partially prepared; that, at Mrs. Keihl's request, she continued the preparation of the breakfast, and both sat down to eat it; that they partook of coffee, and both got very sick and vomited violently. Then the witness went on to say Mrs. Keihl felt dreadfully, and said she believed they were poisoned. 'I asked her who she thought could do such a thing as that; she did not say. She said she felt so sick that she would lie down on the floor; all appeared black before my eyes; I felt sick; I said I wished I had a doctor. She said she believed we would get better again. She then sat up on the floor and laid on a chair, then I went down and she went down. I said then, I will go home. I was to sweep and black the stove, and that,' she said, 'I was not able to do. I started home, then she said, when I left, 'if I get such another good coffee and get sick, she would let me know and come in again, and see what was in it that made her so sick.' I started for home then, and she was sitting on the chair; she was looking at some seeds, and I went out of the gate. Then she came to the door, and stood under the door and said good-bye, I saw Mrs. Beals when I went out. * * * In going home I fell down a couple of times with weakness. I felt so bad.'

"On Friday, the 30th of May, Mrs. Keihl died, about half-past 9 o'clock.

"Mrs. Reed further testifies, that the next time she saw Mrs. Zell was on Tuesday evening, after her death. That she then told Mrs. Zell that she was so shocked to hear that Mrs. Keihl was dead. That Mrs. Keihl had asked her to come if she got worse, and that she and Mrs. Kiehl had both got sick of that good coffee Mrs. Zell had made. Mrs. Zell said she did not know Mrs. Keihl had thrown up so, but only that Mrs. Reed had thrown up; and that Mrs. Zell admitted she had drawn the coffee, and took it home, what was left of it, and used it in the morning; and that it did not make them sick. That Mrs. Keihl had thrown up so she did not know what to do. That she (Mrs. Zell) had waited on her (Mrs. Keihl). That then she (Mrs. Reed) asked Mrs. Zell why she did not send for a doctor. That Mrs. Zell replied, God Almighty was her doctor, and she did not want any other.

"It seems that the house in which Mrs. Keihl resided was closed up after her death, and remained unoccupied for some time, Joseph Kutz, the son-in-law, having the keys, and 'Squire Wynkoop afterwards coming into possession.

"Frederick Hayes testifies that he went to the house on the 28th of July after Mrs. Keihl's death, and got from the kitchen two tin coffee pots, which he took directly to Horn, the chemist, and gave them to him; and it appears, by the testimony of other witnesses, that after Wynkoop got possession, a package, labeled

'arsenic, poison,' was taken from a bandbox found under the bed in the up-stairs front room by Mrs. Wynkoop, and that this was subsequently placed in the hands of Horn.

"Mr. Horn testifies he afterwards made a chemical analysis of the substances found in the coffee pot, and that he found arsenic. He also testified that he examined the substance contained in the package labeled 'arsenic, poison,' and believes it to be arsenic.

"Mrs. Anna Minnich testifies that on the Wednesday morning before Mrs. Keihl's death, between 7 and 8 o'clock, as near as she can remember, she saw Mrs. Zell with a bowl and plate going from her own house in the direction of Mrs. Keihl's house, and that Mrs. Zell said that she was taking Mrs. Keihl some coffee and something to eat; and Levi Barrick, another witness, testifies that between 7 and 8 on the Wednesday morning before Mrs. Keihl died, he came to the house with a load of wood to sell, and that Mrs. Zell was there when he came, and told him Mrs. Kiehl had hurt herself pretty badly, that she had fallen down stairs, that Mrs. Zell, at Mrs. Keihl's request came out, looked at the wood, and reported to Mrs. Keihl, and that Mrs. Keihl bought the wood and he unloaded it.

"S. M. Leidich, Esq., another witness, testifies that he was present at the coroner's inquest and heard Mrs. Zell examined as a witness before the inquest, and that she said then that she had not been at Mrs. Keihl's house at all on the Wednesday before her death, but that she had been there on Thursday, and took to her some sage tea and toast, and that all Mrs. Keihl got on Thursday she herself gave to her.

"As to the finding of the package labeled 'arsenic, poison,' Benjamin Long testifies that sometime after Mrs. Keihl's death, and after Wynkoop got possession of the house, he, witness, went through the house, and that Mrs. Wynkoop and Mrs. Zell were there, and that Mrs. Wynkoop found the package in a bandbox under a bed, in the front room, that contained notions, scraps; that Mrs. Wynkoop and Mrs. Zell looked at it; and handed it to the witness, and that 'Squire Wynkoop came, and, according to the testimony of Mrs. Wynkoop, this package was given to Mr. Horn.

"The two Kutzes testify to a careful examination having been made of the bandbox under the bed in the front room, up stairs, at the time Mrs. Kiehl was lying a corpse in the house, and that there was nothing in the box but ribbons and some loose paper, and that they saw nothing that looked like this package.

"Evidence has also been produced for the purpose of showing that the prisoner had the opportunity of administering poison to the deceased; that she was the person who attended and waited on the deceased during Thursday and Friday and up to the time of her death on Friday night; that no near relatives were called in

[Zell *v.* Commonwealth.)

during the sickness; and that she also was in to market and in her usual health on Saturday. The Commonwealth's counsel contend that the evidence sufficiently proves that the death of Mrs. Kiehl was caused by arsenical poisoning, and that the prisoner wilfully and with the intention to kill her, administered to her the poison which caused her death.

"On behalf of the prisoner it is contended:

"1st. That the evidence does not sufficiently prove that the death of the deceased was caused by poisoning.

"2d. That if the death of the deceased was caused by poison, that she took the poison of her own volition, and not through the criminal act of another; in other words, that it was an act of suicide.

"3d. That if the death of the deceased was caused by poison wilfully administered by another, with the intention of killing her, the prisoner is not the guilty person, and that the evidence does not justify her conviction.

"The chemical analysis made by Mr. Horn is attacked on the ground that it was not made with sufficient care and accuracy to justify the conclusion that there was any arsenic at all in the substances submitted to him for analysis. And Drs. Heims and Hedden, both analytical chemists, have been called as experts, and they say the statements made by Horn, as to the manner in which he purified his re-agents used in his analysis, does not show that they were so purified as to preclude the possibility of the arsenic which he discovered being produced from the re-agents themselves; that, from his statement, they are not satisfied that his re-agents are free from arsenic; and that therefore they doubt the conclusions at which he arrived, and cannot say that the result of his analysis shows sufficiently that there was arsenic in the substances analyzed. You will remember the testimony of these gentlemen, and in considering it you will remember also the testimony of Mr. Horn. Mr. Horn testifies, most unequivocally, that he purified and tested the purity of his re-agents with the greatest care, and satisfied himself that they were absolutely free from arsenic.

"In support of the theory that if Mrs. Keihl died from the effects of poison that she poisoned herself of her own volition, and not through the criminal act of another—that it was an act of suicide, several witnesses have been called. William Sheaffer testifies that, in the latter part of 1875, Mrs. Keihl came to live with his daughter, and lived with her some three months; that during that time she seemed to be in great trouble, and sometimes sat down and cried, and said that no one should wonder if she put herself out of the way.

"Sarah Nickey testified that during last winter and spring she met Mrs. Keihl at Mrs. Zell's house often, and conversed with her; that she seemed to be in trouble all the time, and said if things did

[Zell *v.* Commonwealth.]

not go better she should put herself out of the way, and that Mrs. Zell said she should not talk so.

" Joseph Ebright said that three or four weeks before Mrs. Keihl died she was talking to him in the garden, and said it would be no wonder if she would destroy her life, that she had such trouble.

" But again, the prisoner's counsel contend that if indeed it be true that the death of Mrs. Keihl was caused by arsenic wilfully administered to her by some person with the intention to kill, that the prisoner is not the guilty person who thus administered the fatal poison; that she had no apparent motive to take the life of Mrs. Keihl; that Mrs. Keihl was her friend, and that her presence at her house during the last hours of her life was not for the purpose of taking her life, but to administer to her wants, as an act of neighborly kindness.

" An effort has been made to break down the testimony of Mrs. Rebecca Reed, one of the principal witnesses on the part of the Commonwealth, by impeaching her character for truth and veracity, and by charging that she made other statements inconsistent with the truth of what she has testified to on the witness-stand, and also to contradict her testimony.

" Abram Nisley and Franklin Wolf testify that on the 28th of last May, Wednesday preceding Mrs. Keihl's death, when Mrs. Reed said she got so sick from coffee, they were at work on the roadside out at North Middleton; that Mrs. Reed came that way home, and that Nisley made the remark, she was late; that she replied she was in at Mrs. Keihl's cleaning house; that Franklin Wolf went down to get a set of harness; that she asked what she had said about being down at Mrs. Keihl's; that he said she had stated she was down cleaning Mrs. Keihl's house; that she replied she had not said that, but that she said she was to stay and clean and black the stove, but was sick and could not.

" Mrs. Catherine Beales testifies that on the Wednesday Mrs. Reed was at Mrs. Keihl's house she heard from her own house a rubbing on the stove as though some one were blacking it; but in rebuttal, Mrs. Anna Kutz, Miss Ella Kutz and Joseph Kutz all testify that on the day of the funeral of Mrs. Keihl the kitchen stove was red on the top and dusty on the top, and the sides looked as though it had not been blackened for a long time.

" I should say right here in regard to Susan Beales, another witness, who, from sickness, was unable to be here to testify, that it is admitted on the part of the Commonwealth that she would testify that she saw Mrs. Reed black Mrs. Keihl's stove on Wednesday morning, the 28th May 1879, in the morning, and this statement is to be considered the same as if it had been testified to by the witness on the stand.

" Polly Hanson, a colored girl, says she was at Mrs. Kiehl's on

a Wednesday, that Mrs. Reed was there, and that Mrs. Reed gave her a cup of coffee, that she drank it and she did not get sick.

"The testimony of Susan Hunter, Sarah Nickey and others for the prisoner is relied on to show that Mrs. Zell could not have been at Mrs. Keihl's house on the Wednesday before her death.   Mrs. Catharine Beales testifies she saw Mrs. Keihl in the morning in her kitchen getting breakfast; saw her at breakfast at 8 o'clock, and that between 2 and 3 o'clock Friday afternoon she heard Mrs. Keihl groaning; that she went down to Mrs. Zell; that Mrs. Zell went up to her house that evening; she went in to see Mrs. Keihl and helped to lift her up; and that she was then dying.

"The testimony of Mrs. Hunter, Joseph Ebright, Catharine Beales, Mrs. Charlotte Fought and others is relied upon to show that no wood was brought to Mrs. Keihl's house on the Wednesday before her death, as testified to by Levi Barrick.   But it must be remembered that these witnesses say that they did not see any wood brought there, or heard any thrown off at her door; whilst Levi Barrick most positively says that he did bring it there on that day.   Mrs. Hunter says that she saw Levi Barrick bring the load of wood on the Wednesday prior to the week that Mrs. Keihl took sick.   You will remember that Levi Barrick is the man that says he brought the load of wood to Mrs. Keihl's house on the Wednesday preceding her death, and that Mrs. Zell was present at the house.

"Nancy Campbell and Mrs. Hunter testify that between Mrs. Keihl and Mrs. Zell there existed most friendly relations; that she visited her and no one else; and that Mrs. Keihl said several times, she wanted her to come and work for her; that Mrs. Zell was very kind to her; pumped her water, and carried it home for her.

"Mrs. Amanda Wynkoop testifies she found a package labeled 'arsenic' in the bandbox up stairs in the front room; that there were patches and scraps of silk in the box, no ribbons, and that she found the package which was found, and found the name written on it which is now written on it.   In reference to this, Mrs. Amanda Kutz and Ella Kutz testify that when they examined the bandbox on the day of the funeral these scraps and patches were wrapped together in little bundles, each of a kind or color, and that they were in a basket, and not in a bandbox."

When the case was called for trial, William McAllister, the first juror, was passed without challenge by the Commonwealth's counsel, over to the prisoner, and the prisoner accepted him.   He was then, at the request of the district attorney, ordered to stand aside, and was not again called until the whole panel had been gone through with, when he was challenged peremptorily by the Commonwealth, and the challenge sustained against the objection of the prisoner's counsel.

[Zell *v.* Commonwealth.]

In overruling a motion for a new trial, among the reasons assigned for the same was the above action.

The court said, in reference thereto : " This, I think, was clearly right. It became manifest to the court, that the Commonwealth's counsel, from want of knowledge of the intimate friendly relations existing between this juror and the prisoner, had made a mistake, in the first instance, in passing him, and that no unfair advantage was intended. None of the jurors had as yet been sworn, and the Commonwealth's peremptory challenges were not exhausted. The right to challenge peremptorily is as absolute as the right to challenge for cause, and I can discover no sensible reason for making any distinction in the manner of exercising either. I hold that the Commonwealth as well as the accused may exercise their right of challenge at any time before the jurors are sworn. A fair and just administration of the criminal law will admit of no other safe rule."

Several jurors under objection were challenged by the Commonwealth for cause, without having been first sworn on their *voire dire* to make true answers. This action of the court was also assigned as a reason for a new trial, and in refusing the motion the court said :

" The examination of the jurors, as they were called, without being first sworn on their *voire dire*, was not objected to—not a word was said about it at the time by either side, and I am well convinced that no injustice was done to the prisoner in this respect. If the prisoner and her counsel did not acquiesce in it, why was the objection reserved until after the rendition of the verdict ?

" As to the swearing of the jury, the law does not require that each juror shall be sworn as soon as he is chosen. I never knew it to have been done in this court, and I think it is much the better practice not to swear any until all have been chosen."

At the trial, Mrs. Reed, a witness for the Commonwealth, testified, inter alia, as follows : She (Mrs. Keihl) sat in the kitchen when I came, and she asked me to finish breakfast. She said that Mrs. Zell had started breakfast, and that she had come in a big hurry out of the room—

Q. By Mr. *Hepburn.*—No matter about that. If there was anything that she said about Mrs. Zell that you did not afterwards tell to Mrs. Zell, do not repeat it, but tell only what occurred between you and Mrs. Keihl about Mrs. Zell that you afterwards told to Mrs. Zell ?

A. Well, Mrs. Keihl said then that their coffee was on.

The *Court.*—The admission of this testimony is restricted to what she afterwards communicated to Mrs. Zell and which Mrs. Zell admitted—

Mr. *T. Cornman.*—To be true.

The *Court.*—Yes, sir.

[Zell *v.* Commonwealth.]

Witness.—Well, she said that Mrs. Zell had brought the coffee up. She had made it at her house. She said she had made it while she was getting breakfast, and she said that Mrs. Zell said it was such good coffee. I finished breakfast.

Q. By Mr. *Shearer.*—Mrs. Keihl said that Mrs. Zell had brought the coffee up and made it at her house, at Mrs. Zell's house?

A. Yes, sir.

Q. By Mr. *Hepburn.*—Go on and state whether you then drank, both of you, all that coffee?

A. Yes, sir; we got the coffee; I then got sick. We had to throw up so, and Mrs. Keihl was very sick and had to throw up too.

Q. State how long you were sick and how it affected you. State, then, all that you did there that morning before you left, and how you went home?

A. Well, after I had drank a couple of swallows of coffee I said that I was so sick that I said I believed I would walk out. I did. I felt so dreadful when I came, I told Mrs. Keihl I had been so sick, had to throw up so, and she said she felt bad too, had to throw up. She took her chair back from the table, and had to throw up at the stove, she said she felt dreadful. While we were throwing up she said she believed we were poisoned. I asked her who she thought could do such a thing as that. She didn't say, just afterwards throwed up again. I said I was so sick I believed I would lie down on the floor of the room. She said I should go up stairs. When I got up stairs I fell on the floor. All appeared black before my eyes, I felt so sick; I said I wished I had a doctor. She said we would get better again. She laid down, then sat up on the floor and laid down on the chair. Then I went down, and she went down. She said that she must shut the front door (Mrs. Zell had laid it open). She came up again; went down awhile. I went down and she went down too. I said then that I would go home. I was to sweep and blacken the stove, and that, I said, I was not able to do. I started home then, and she said when I left, if she gets such another good coffee and gets sick, she would let me know, and come in again and see what was in it that made her so sick. I started for home then and she was sitting on the chair. She was looking at some seeds, and I went out of the gate, then she came to the door, and she was standing under the door, and she said good-bye. I saw Mrs. Beales when I went out. She was washing. I told her I was so sick all the morning, I did not know how I could get home. I started home then, was very sick going home, fell down a couple of times with weakness; I felt so bad I stopped at Ernst's.

When the court was about to charge the jury, they said: "Before proceeding to the general charge of the court, I will

[Zell v. Commonwealth.]

withdraw some testimony from your consideration, at the request of the prisoner's counsel. At the time the prayer was presented I substantially said what I now will instruct you upon. The prisoner's counsel request us to instruct you that it is your duty to discard all the testimony of Mrs. Reed as to what she alleges Mrs. Keihl said about Mrs. Zell, from, 'She said that Mrs Zell had started breakfast,' to and including ' Mrs. Zell had laid the front door open.' "

PER CURIAM.—" The only declarations of Mrs. Keihl relating to Mrs. Zell, that were intended to be admitted in evidence, were such only as Mrs. Reed afterwards communicated to Mrs. Zell, and that Mrs. Zell admitted to be true. The only declaration that Mrs. Reed says Mrs. Keihl made relating to Mrs. Zell, that she says she afterwards communicated to Mrs. Zell, that Mrs. Zell admitted to be true, is that Mrs. Zell made the coffee. And even as to this declaration the jury must give no effect to it unless they find that Mrs. Zell admitted it to be true. All other declarations which Mrs. Reed says Mrs. Keihl made about Mrs. Zell, are withdrawn from the consideration of the jury. The jury must reject and discard all such declarations the same as though Mrs. Reed did not testify to them at all."

The defendant offered evidence to show that Mrs. Reed, on Wednesday, the 28th of May, on her way home from Mrs. Keihl's, had met two persons, Nisley and Wolf, and had told them that she had been in at Mrs. Keihl's cleaning her house ; for the purpose of showing that she could not have been sick, because she said nothing about it at that time. Other evidence had been offered of the same tenor.

The Commonwealth then offered to prove that on the same Wednesday, also, on her way home, but before she met Nisley and Wolf, she stopped at the house of Miss Ernst, asked for a drink of water, and said that she was in at Mrs. Kiehl's, had taken breakfast there, and was make sick by coffee, for no other purpose than to show that the story was not fabricated after the inquest.

The court admitted it thus :

PER CURIAM.—" The proposed testimony of the witness is admitted for the purpose only of showing that Rebecca Reed's statement is not a fabrication of recent date, and it is not admitted for any other purpose, and cannot be used for the purpose of showing that her statement is true."

Testimony of a Mr. Leidich, of a like character, was also admitted under the same offer.

The defendant submitted the following points, to which are appended the answers of the court:

1st. That to justify a conviction in any event, the *corpus delicti*

[Zell *v.* Commonwealth.]

must be established by overwhelming evidence, and that, if it is not so established or proved, they should acquit the defendant without inquiring further.

Ans. "To establish the *corpus delicti* the evidence is sufficient when it fully satisfies the jury of the fact beyond all reasonable doubt."

2d. That the evidence in the case must be such as to exclude any reasonable hypothesis consistent with the innocence of the defendant; otherwise, the jury must acquit.

Ans. "This point is answered in the affirmative, and we instruct you that the evidence in the case must be such as to exclude any reasonable hypothesis consistent with the innocence of the defendant; otherwise, the jury must acquit."

The prisoner was found guilty, and after sentence took this writ, among her assignments of error being the following:

1st. The court erred in allowing the Commonwealth, against the prisoner's protest, to stand William McAllister, a juror, aside until the panel should be exhausted, after the Commonwealth had declined to challenge him, and declared they did not challenge him, and after the prisoner had elected and accepted him as a juror.

2d. In allowing the Commonwealth to challenge peremptorily the said McAllister, after they had accepted him, and after the prisoner had elected him, and when the prisoner asked to have him sworn as a juror.

3d. In allowing the Commonwealth to challenge the sixth, the sixteenth, the twenty-fourth, the thirty-third, the fortieth and the forty-second jurors called, for cause, on account of the respective answers made by those jurors, without any of them having been first sworn on their *voire dire* to make true answers, and because of the insufficiency of those answers.

6th. In admitting the testimony of Rebecca Reed as to what she alleged Mrs. Keihl had told her about Mrs. Zell; and that this was not cured by the instruction which the court gave the jury as to the part of the testimony of Rebecca Reed they should receive. The court should have expressly withdrawn all that counsel for prisoner asked to have withdrawn when it was asked, and before counsel for prosecution addressed the jury.

7th. In overruling the prisoner's objection to Anna Ernst's testimony about what she said Mrs. Reed told her on her way home on the 28th day of May 1879, and in admitting her testimony, no recent fabrication having been alleged.

8th. In overruling the prisoner's objection to Mr. Leidich's testimony as to what Mrs. Reed told him, and in admitting anything that he said Mrs. Reed told him.

15th. In refusing the first point of defendant.

18th. In not instructing the jury that the absence of all motive,

[Zell v. Commonwealth.]

whether of avarice or revenge, affords a strong presumption of innocence.

19th. In not instructing the jury that this being a case of circumstantial evidence only, the jury, in order to convict, must find the circumstances clearly proved as facts, and must also find that these facts clearly and unequivocally imply the guilt of the prisoner, and that they cannot reasonably be reconciled with any hypothesis of her innocence.

20th. This being a case of purely circumstantial evidence, the court erred in failing to instruct the jury that not only must all the circumstances concur to show that the prisoner committed the crime, but also that they all are inconsistent with any other rational conclusion.

21st. That the refusal of the court to grant a new trial for any and all the reasons presented therefor, was such a mistaken comprehension and exercise of the discretionary power of the court as resulted in injustice to the prisoner, and justifies her in asking, and the Supreme Court in granting, her prayer for a reversal and a new trial.

22d. The ingredients necessary to constitute murder in the first degree were not proven to have existed in this case, and the court erred in not so instructing the jury.

*W. J. Shearer, John Cornman* and *Theo. Cornman,* for plaintiff in error.—The setting aside a juror is, in effect, a challenge for cause without assigning cause presently. The Commonwealth may exercise this right in the first instance, but not after the juror has been found acceptable to and chosen by the prisoner. Were it otherwise, the Commonwealth might compel the defendant to exhaust his peremptory challenges, by setting aside those acceptable to defendant, and reserving its peremptory challenges until that time.

In Commonwealth v. Twitchell, 1 Brewst. 553, Judges Ludlow and Brewster held that "after a juror has been called, handed over and accepted by the defendant, the Commonwealth cannot stand him aside," and this error is not cured by the verdict, under the Act of 21st of February 1814, since the provisions of this act extends only to "defect or error in the precept, * * * or in drawing, summoning and returning any juror or panel of jurors."

The second assignment of error is to the peremptory challenge of this same juror, and although there are numerous precedents for the challenge of a juror for cause at any time before he is sworn, we have been unable to find a single case in Pennsylvania where a peremptory challenge has been allowed under these circumstances.

The third assignment of error is that the court allowed a number of jurors to be challenged for cause, because their answers were not made under oath.

In Wharton's Criminal Law, sect. 3130, it is held that "the

[*Zell v.* Commonwealth.]

correct practice is immediately after the juror is challenged, to swear him on his *voire dire*, and that the juror must, of course, be sworn on his *voire dire* before he can be interrogated:" Id. sect. 3105. It is no answer to this to say the prisoner did not ask to have the juror sworn. Such a request might prejudice the juror against the prisoner.

In Wharton on Homicides, sect. 728, it is stated: "Unless the evidence of the *corpus delicti* be overwhelming, the court should not permit a conviction. If the expert testimony renders it uncertain whether deceased was or was not poisoned, a conviction cannot be sustained, even on the defendant's confession:" Whart. on Hom., sect. 728. So long as the least doubt exists as to the act, there can be no certainty as to the criminal agent: Starkie on Ev., 10th ed. 861. It must be clear and unequivocal where the proof is presumptive: Best's Law of Ev., sect. 441.

The court erred in not instructing the jury that the absence of all motive, whether of avarice or revenge, affords a strong presumption of innocence. This exception is drawn in the language of Starkie on Ev. 848, n. A., and is an error of omission on part of the court, of which the prisoner has as much right to complain as of an error of commission.

In Myers *v.* Commonwealth, 2 Norris 131, PAXSON, J., says: "It is the duty of the judge trying a man for his life to charge fully upon the law, without regard to points."

Motive, opportunity and possession of the poison are essential matters of proof: Whart. on Hom., sect. 727; Ros. Crim. Ev., 711, 715–16; Whart. Crim. Law, 3489, 3494, 3494, a.

If the absence of motive and of any proof that the prisoner had procured poison, or had it in her possession, be strong circumstances in her favor (and that it is the authorities are abundant), surely she had a right to expect that the court would, in the conscientious discharge of its duty, so instruct the jury, whether requested so to do or not. In this case the language in Myers *v.* Commonwealth, 2 Norris 131, would certainly apply: "To say that the judge is not to be convicted of error for what he omits to say ought not to be applied to capital cases. A prisoner has a right to have the jury properly instructed on every question of law." The absence of proper instruction is ground for a new trial: Whart. Crim. Law, vol. 3, sect. 3252.

If the mere fact of poisoning includes—is taken as conclusive of—all the ingredients of murder in the first degree—surely that single fact, on which life and death depends, should be made clear as light. Where, as in this case, the evidence is altogether circumstantial and shows no administration of poison—no possession or knowledge of poison—no motive for the foul deed—but the motives of interest and affection against the crime, and where a friend is charged with poisoning a friend, certainly the Common-

[Zell v. Commonwealth.]

wealth has utterly failed to prove the necessary ingredients of murder in the first degree.

*George S. Emig, E. W. Biddle* and *S. Hepburn, Jr.*, for the Commonwealth.—The Commonwealth has the right to stand aside a juror after he has been accepted by the defendant: Warren *v.* Commonwealth, 1 Wright 45; Hartzell *v.* Commonwealth, 4 Id. 462. McAllister was the first juror called. The usual questions as to his competency as a juror were put to him and he was requested by the district attorney to stand aside. For the purpose of raising the question we admit that the district attorney declined to challenge him peremptorily, and that the defendant accepted him before he was requested to stand aside. He was passed as a juror against whom no cause of challenge appeared. Afterwards the Commonwealth's attorneys thought that a grave mistake had been made in passing him; and they asked leave of the court to exercise their right to challenge him peremptorily. At this time but four jurors had been called, and none had been challenged peremptorily by the Commonwealth, and no juror had been sworn. The court declined to allow the challenge to be made at that time, but suspended the motion to see whether it would be necessary to act upon it. The panel was afterwards exhausted. McAllister was recalled, and the motion again came up. The Commonwealth's challenges were still not exhausted.

There is no law requiring that all jurors shall be sworn on their *voire dire* as they are called, though neither side request it. In Cumberland county the practice has been to examine them without first swearing them, unless request is made by one of the parties. The sixth assignment should not be sustained. Nor should the seventh and eighth assignments: Whart. on Ev., sect. 570; Henderson *v.* Jones, 10 S. & R. 322.

Mr. Justice TRUNKEY, delivered the opinion of tne court, February 24th 1880.

Upon the law of the crime, the charge was full, clear and adequate to the proper instruction of the jury, and all that was said on the law of the evidence was accurate and fair to the prisoner. She has no cause for complaint in the answers to the points, nor that the attention of the jury was directed away from the real questions at issue. The answer to the first point was, " to establish the *corpus delicti*, the evidence is sufficient when it fully satisfies the jury of the fact beyond all reasonable doubt;" and it needs no vindication. In affirmance of the second point, the jury were told " that the evidence in the case must be such as to exclude any reasonable hypothesis consistent with the innocence of the defendant; otherwise, the jury must acquit." They might have been instructed very properly on those things mentioned in the 18th.

[Zell *v.* Commonwealth.]

19th and 20th assignments; but as no request was made therefor, it is presumed that the zealous and intelligent counsel knew they were well impressed on the jury.   It often happens that during the progress of a trial, principles. respecting the nature and purpose of evidence are agreed on by counsel, or stated by the court, in presence of the jury, so that it would be idle to reiterate them in the charge.   To adopt a principle which would require reversal because of the omissions complained of, would be_productive of evil continually; for it is rare that something is not omitted which counsel can discover after the trial, though not thought of at the time. When the charge was just to the prisoner, and the points fully answered, the court will not be convicted of error for not having instructed on a point which was not presented.

No request was made that the jurors be sworn on their *voire dire,* nor objection made to their examination without, nor exception taken to the allowance of the challenges for cause; and, therefore, the third assignment of error is groundless.   However, we will remark that though it may not be erroneous to omit the oath, unless it be requested to be taken, yet, so far as advised, it is the more general practice, and, we think, the better one, to examine the juror under his oath.   The testimony of the juror, or of others, on which to ground a challenge, before the court which is now the trior, must be under oath or affirmation unless waived; and why infer a waiver in the absence of a formal demand?   As well might the witnesses be examined without being sworn when neither party requests that the oath be administered.

Although the juror, McAllister, was directed to stand aside, without objection, afterwards the prisoner demanded that he be sworn, and excepted to the allowance of his peremptory challenge by the Commonwealth.   The practice of " standing aside " jurors is ancient, has come to us from England like most of our customs and laws, and is not changed by the allowance of peremptory challenges: Warren *v.* Commonwealth, 1 Wright 45.   The prisoner's counsel say, " The setting aside of a juror is in effect a challenge for cause, without showing any cause presently."   The right of the Commonwealth and that of the prisoner to challenge for cause stand on the same ground.   One is as sacred as the other. The mere passing of the juror over to the court or to the opposite party is not an absolute waiver of the right to challenge, if good cause be shown afterwards.   This power to challenge for cause at any time before the oath is tendered might be abused.   If the objection to a juror be kept back at the regular time for an improper reason, or from motives of mere caprice, it would be just to declare the right wholly waived, and the discretionary power to do so ought not to be denied: McFadden *v.* Commonwealth, 11 Harris 12.   The power here spoken of refers to challenges by the Commonwealth.   Whether the court can deny the prisoner's chal-

[Zell v. Commonwealth.]

lenge, either for cause or peremptory, at any time before the oath is tendered, though his objection was kept back at the regular time for an improper reason, or of mere caprice, is not a pending question. The power to permit the "standing aside" of a juror and afterwards to allow a challenge by the Commonwealth, is essential to the due administration of justice: Commonwealth v. Joliffe, 7 Watts 585. Since the Act of 1860, the Commonwealth is entitled to four peremptory challenges, which may be made at any time before the panel is full, and passing by individual jurors and permitting them to be challenged by the prisoner or sworn, is no waiver of that right: Hartzell v. Commonwealth, 4 Wright 462. Whenever she may challenge for cause, she may peremptorily, until the number is exhausted. The court was right in allowing the peremptory challenge of McAllister—the facts show no improper motive in passing the juror, nor in standing him aside—it was a just exercise of discretionary power, and the first and second assignments are not sustained.

The testimony to which the seventh and eighth assignments relate, was admissible for the sole purpose of showing that the statement of Mrs. Reed was not a fabrication of recent date: Hester v. Commonwealth, 4 Norris 139. It is true that the defence did not, in very words, charge that it was recently fabricated; but the story of her own sickness at the house of the deceased was attacked, and also her character for truth, which made it competent to prove that she made the same statement at the time merely as bearing on her credibility.

Many of the twenty-two assignments will not be remarked. Some, as the tenth and eleventh, are to matters not on the record nor in any bill of exception, and some, as the seventeenth and twenty-first, cannot be sustained without violence to settled principles; others are to rulings which are plainly right. In reference to the last assignment, there was sufficient evidence to submit to the jury, and if it established guilt of the felony charged, there could be no question of the necessary ingredients to constitute murder of the first degree, for the statute declares that all murder perpretated by means of poison shall be deemed murder of the first degree.

We are of opinion there was error in receiving the testimony in the sixth assignment which was not cured by its withdrawal. It is not alleged that the declarations of Mrs. Kiehl to Mrs. Reed were evidence, unless they were afterwards repeated by the witness in a conversation between herself and the prisoner. Except a single remark, they were not repeated, and the court, at the commencement of the charge, instructed the jury to reject and discard all such declarations, the same as though Mrs. Reed had not testified to them, and that the ones intended to be received were such only as Mrs. Reed afterwards communicated to Mrs. Zell, and

13 NORRIS—18

[Zell *v.* Commonwealth.]

which Mrs. Zell admitted to be true. Had the natural order been pursued, namely, first prove what was said in the conversation between the witness and Mrs. Zell, no difficulty could have arisen respecting the admissibility of Mrs. Kiehl's declarations. Indeed, in some parts of the state, in trials of criminal causes, the practice of receiving incompetent evidence, on the promise that it shall be made competent by subsequent testimony, is unknown, though such practice in civil causes is familiar.

Tighlman, C. J., in Stewart *v.* Huntingdon Bank, 11 S. & R. 267, said, "It has grown into a habit, within these few years, for counsel to propose a chain of evidence, the first links of which depend on those which follow, and would not be competent without them." He remarks the incident dangers, and adds, "The court should, therefore, keep a wary eye on proceedings of this kind, and take care to instruct the jury to pay no regard to the evidence which they have heard whenever the condition on which it was introduced, is not complied with." At a much more recent date, it was decided that if improper evidence is given tending to inflame the damages, and it is not struck out at or before the close of the testimony, so that counsel shall not be allowed to refer to or dwell upon it in their address to the jury, it is altogether too late to cure the mistake by directing the jury to disregard it in the charge: Railroad Co. *v.* Butler, 7 P. F. Smith 335. Whenever the incompetent testimony received is of such a character as to inevitably tend to prejudice the minds of the jurors, the error is not cured by the court telling them, after the argument has closed, not to consider it: Railroad Co. *v.* Decker, 1 Norris 119. The rule is settled that, in civil cases, if incompetent testimony is not withdrawn before the argument, and so that it be reasonably certain that its poison has not infected the whole case, the error in the receiving of it is not cured. What then ought to be the rule where life or liberty is at stake?

If it has become a custom, in capital cases, to receive incompetent evidence, on the faith that it will become competent before the trial closes, would it not be well to abandon it? Where such evidence has been made competent by subsequent proofs, there will not be a reversal because it was prematurely received. If withdrawn at a time and in a way that makes it certain the accused was not prejudiced, the error would be cured. But if its tendency was to affect the credibility of a witness, or to establish the prisoner's guilt, who can say it was effaced from the juror's mind? Much pains is taken to get an unbiased and pure mind, as white paper, on which to write the legal evidence, and it should not be purposely blotted with irrelevant matter. Once fouled it is hard to clean. Here, the incompetent testimony was not very important in itself, but it was pressed by the Commonwealth, the witness repeatedly cautioned as to what she should say, and it must have

[Zell v. Commonwealth.]

been impressed on the jury as a material thing. How much it may have added to the credit of Mrs. Reed, or whether it tended to the conviction in the minds of the jury of the prisoner's guilt, none can tell, and because of that uncertainty it should not have been admitted. Moreover, it was not promptly withdrawn when it became certain that the condition on which it was introduced was not complied with.

> Judgment reversed, and the record, with this opinion, setting forth the causes of reversal, is remanded to the Court of Oyer and Terminer of Cumberland county for further proceeding.