Commonwealth *v.* Kravitz, Appellant.

Argued October 15, 1959.   Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and McBRIDE, JJ.

reargument refused June 27, 1960.

*Mortin Witkin,* with him *William L. O'Hey, Jr.,* for appellant.

*Bernard E. DiJoseph,* District Attorney, with him *J. W. Ditter, Jr.,* Assistant District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE BELL, April 18, 1960:

Max Kravitz, husband of the defendant, was killed in their home, 1250 Knox Road, Wynnewood, Pennsylvania, on July 4, 1958.   The jury on December 12, 1958, after a trial lasting 12 days, found the defendant guilty of murder in the second degree, with a recommendation of mercy.   Four days later defendant filed a motion in arrest of judgment and a motion for a new trial, assigning customary reasons.   More than two months later,* defendant filed 21 additional reasons

---

* After a transcript of the testimony and charge of the Court which consisted of 1536 pages, had been filed.

to support her motion in arrest of judgment and 45 additional reasons for a new trial.

The next day defendant filed another motion for a new trial containing additional reasons based on after-discovered evidence, which alleged that a tipstaff, who had the jury in charge, discussed the case with certain jurors on numerous occasions during the trial. The lower Court (with four Judges sitting en banc) dismissed defendant's motions in an exceptionally able 40 page opinion. The Court then sentenced defendant on July 17, 1959, "to the State Industrial Home for Women at Muncie, Lycoming County, Pennsylvania until the sentence of the Court has been complied with."

The most important question in this appeal is whether the lower Court erred in dismissing defendant's motion in arrest of judgment.

The test of the sufficiency of the evidence—irrespective of whether it is direct or circumstantial—is whether accepting as true all the evidence upon which, if believed, the jury could properly have based its verdict, it is sufficient in law to prove beyond a reasonable doubt that the defendant is guilty of the crime charged, i.e., the murder of Max Kravitz: *Commonwealth v. Sauders,* 390 Pa. 379, 134 A. 2d 890; *Commonwealth v. Boden,* 399 Pa. 298, 159 A. 2d 894; *Commonwealth v. Homeyer,* 373 Pa. 150, 94 A. 2d 743; *Commonwealth ex rel. Garrison v. Burke,* 378 Pa. 344, 106 A. 2d 587; *Commonwealth v. Kloiber,* 378 Pa. 412, 106 A. 2d 820; *Commonwealth v. Bolish,* 381 Pa. 500, 113 A. 2d 464; *Commonwealth v. Lowry,* 374 Pa. 594, 98 A. 2d 733; *Commonwealth v. Blanchard,* 345 Pa. 289, 26 A. 2d 303; *Commonwealth v. Bishop,* 285 Pa. 49, 131 A. 657; *Commonwealth v. Danz,* 211 Pa. 507, 60 A. 1070.

In *Commonwealth v. Phillips,* 372 Pa. 223, 93 A. 2d 455, the Court said (page 227): "It has become customary for a defendant in his argument before an Appellate Court to base his claims and contentions upon

his own testimony or that of his witnesses even after a jury has found him guilty. This, of course, is basic error. After a plea or verdict of guilty, 'we accept as true all of the Commonwealth's evidence upon which, if believed, the jury could have properly based its verdict: Com. v. Blanchard, 345 Pa. 289, 296, 26 A. 2d 303, 306 (1942). See also Com. v. Karmendi, 328 Pa. 321, 324, 195 A. 62, 63 (1937); Com. v. Watkins, 298 Pa. 165, 168, 148 A. 65, 66 (1929); Com. v. Carelli, 281 Pa. 602, 605, 127 A. 305, 306 (1925); Com. v. Priest, 272 Pa. 549, 550, 116 A. 403 (1922); Com. v. Diaco, 268 Pa. 305, 306, 111 A. 879, 880 (1920).' Commonwealth v. Logan, 361 Pa. 186, 192, supra."

We shall summarize the 1500 pages of circumstantial evidence produced by the Commonwealth upon which the jury could properly have based its verdict that defendant had murdered her husband, Max Kravitz.

Max Kravitz was murdered on the afternoon of July 4, 1958. He was alive at 12:15 p.m. on July 4th when he telephoned a friend about swimming, and at lunchtime when defendant brought him a chicken sandwich. At approximately 2:45 p.m. on July 4th, Mr. and Mrs. Paul MacMurray were on their lawn approximately 305 feet away from the Kravitz residence. Three times they heard the noise of breaking and falling glass in the Kravitz residence. Believing a burglary was being committed, MacMurray ran to the Kravitz home and noticed a tear in a window screen and a broken windowpane behind the screen; these were later described as being in the marital bedroom. MacMurry saw no one about the premises or entering or leaving it. Hearing a man's loud voice, he ran back to his home and called the Lower Merion Township police, who arrived in police cars at approximately 3 o'clock at the Kravitz home. They surrounded the house and saw no one enter or leave.

Patrolman Mould heard a man's loud voice in the house. He rang the front doorbell and Mrs. Kravitz appeared within a minute. He asked her if everything was all right and she said it was. She was then asked about the broken glass and she replied "We know about it". Defendant was calm, cool and collected. She was wearing a multi-colored dress which she changed before other witnesses saw her at 4 p.m.

Defendant came to the residence of her in-laws, Mr. and Mrs. Morris Passon, without telephoning and without being expected. This was the first time she had ever come to the Passon home alone, without her husband. She was wearing a different colored dress than when she was seen by the police officers. She told them that she had been gardening; that she was putting Bovung on the rosebed in their garden; that she had to carry buckets of water to the rosebed because there was no outside water faucet close by. After gardening she took a shower and changed her dress. Contrary to her statements, Bovung was not placed in the rosebed; there was an outside water faucet close by, and the rosebed was absolutely dry.

The Passons testified that defendant was anxious to get Morris Passon to come back to her home under the pretext of giving him some gardening equipment which turned out to be insignificant and which he refused. She then invited Passon to come up and see her husband. As they came up the cellar stairs the defendant screamed and said "He is in there", meaning their bedroom. When Passon saw decedent lying on the floor he immediately called the police.

Kravitz was found about 4:50 p.m. by the police who came in response to Passon's telephone call. He was lying on the floor on his right side, clad in underwear and shorts. There were deep lacerations around his head. He had been shot in the back, in the left shoulder, and in the left wrist. The testimony dis-

closed that the bullets must have been fired by a person other than the deceased and that the 16 lacerations about the head were caused by a blunt instrument. The defendant's bent and twisted hand mirror was under the victim's body and small pieces of glass were found in the immediate vicinity which had come from the broken hand mirror. The rug was splattered with blood; blood was on the bed sheet; broken glass was around the window; three panes were broken from the inside; a broken bloody statuette was by the window. A chair which was in front of the window contained defendant's multi-colored blouse which was later found to have three drops of blood on it. An intact statuette with blood on it and two red shoes belonging to defendant were found near the chair; the left shoe had blood on the toe and soles. Defendant's plum-colored pedal pushers with blood on the left leg, were lying on the floor in front of the chair. There was a bed sheet and blanket on the floor with blood on them. There were *fragments of gun grips* found on the floor, one of which was under defendant's pedal pushers. No gun was found in the room, but the next day, by brilliant police work, a gun was found in a culvert along the route which defendant told the police she had taken on her way to the Passon home. *The fragments of gun grips found in the Kravitz bedroom fitted this gun from which the gun grips were missing.* There was a wallet on the bureau containing $43 and neither it nor anything valuable was stolen, thus indicating that robbery was not the cause or motive of the murder. Except for the victim's bedroom, the house was in good order.

A pair of red shoes belonging to the defendant were found under the kitchen table and these had drops of blood on them. Defendant kept repeating "Oh God help me". Five witnesses saw defendant at different times crying, but never shedding a tear. To nearly every

question asked, the defendant replied that she did not know what happened.

Dr. Shoemaker examined the deceased at 5:20 p.m. and testified that his death occurred approximately two hours prior to his arrival. He testified with respect to the bullet wounds and to the multiple lacerations of the scalp, some of which were very deep. He and Dr. Simpson testified that a man could have lived 30 minutes after being shot as Kravitz was shot, and during that time could have shouted or cried out and could have moved around the room. Dr. Simpson, the coroner, examined the body at 8 p.m. and was of the opinion that death took place about 3 o'clock p.m.

According to the police and the detectives, there was no evidence of a forcible entry in or out of the house; all the doors except the front door, were locked when the police arrived around 4:50 p.m. Defendant had been gardening until lunch time. After making a chicken sandwich for her husband she said that she went outside the house and did not see her husband again until she and Mr. Passon went to the bedroom.

It is important to note that defendant told different versions of the route she took to the Passon home, which is only a short distance away. At 12:20 p.m., July 5th, detective Loughran discovered a gun in a storm sewer opening on Morris Road, which is about 12 to 15 feet below the surface of the road. It was a 32 U.S. nickel-plated revolver which was subsequently identified by an agent of the F.B.I. as the gun from which the fragments of the gun grips had been found in Kravitz's bedroom. Even more important, the revolver was triple wrapped, with the outer covering being *a woman's blouse, which was later identified as belonging to the defendant*; the second cover being a blood-stained dish towel; and the innermost covering a man's handkerchief. Harry Kravitz testified that his

father owned a gun similar to the one found in the culvert on July 5th.

Moreover, an agent of the F.B.I. testified that a brush and comb on Mrs. Kravitz's bureau contained hair similar to a strand of hair found on the sweater which was wrapped around the gun found in the culvert. The sweater also had a strand of dog hair on it which was similar to the hair of the Kravitz's dog. The dish towel which formed the middle wrapping on the gun found in the culvert was similar to the dish towels found in the Kravitz's residence. The lead bullet found in the Kravitz bedroom contained cotton yarn of similar texture and composition as the yarn which formed the undershirt of the decedent. The man's handkerchief was similar in composition to handkerchiefs found in the decedent's bedroom. Fragments of the gun grips found in the culvert and in the bedroom belonged, we repeat, to the gun found in the culvert* on July 5th.

Several officers who made a test, testified that the noise of breaking and falling glass which was heard by Mr. and Mrs. MacMurray at a distance of 305 feet from the Kravitz house, could have been heard at such a distance, although Mrs. Kravitz stated that she never heard the noise of any breaking glass or any revolver shots.

There is not the slightest doubt that all the ingredients of a first degree murder were present in this case. The Commonwealth's evidence was amply sufficient from which the jury could properly find that Mrs. Kravitz was guilty of this murder. As the District Attorney states, the use of a hand mirror which inflicted 16 lacerations in the head, but were not strong enough to cause a fracture of the skull, and the lack of ability to fire two bullets in the gun, indicated that this was a

---

* There was no evidence with respect to fingerprints.

feminine crime. The jury could properly have found that the blood which was found on defendant's pedal pushers was the blood of her husband, that the blood which was found on defendant's red left shoe in the marital bedroom was the decedent's; that the blood which was found on defendant's shoes in the kitchen was decedent's blood; that defendant at the time she answered the policeman's door-ring was wearing a multi-colored dress which contained blood of the same grouping as that of her husband; that it was the defendant's hand mirror (which was found under his back) which was used to bludgeon him about the head; that defendant in going to the Passon home after the killing, passed the culvert on Morris Road in which the gun with missing gun grips was found, and that the gun grips which were found on the floor in the Kravitz bedroom fitted this gun; that it was the defendant's blouse which was wrapped around this gun; that the strand of Caucasian hair found on the blouse matched the hair found in her hair brush and comb in her bedroom; that the dark hairs found on the blouse were the same as the hair of her dog, Pedro; that the dish towel which was covered with blood and which was wrapped around the gun was covered with blood of the same group as her husband's; that she lied when she said she did not hear the breaking glass which was heard by neighbors 305 feet distant; that she lied when she pretended she was gardening and covering the rosebed with Bovung and with water; that her husband could have broken the bedroom window with a statuette in an attempt to summon help; that defendant's calmness and her wailing without tears were indicative of guilt; and finally, that she made a number of contradictory, conflicting statements which indicated an attempt to deceive the police and conceal her guilt.

Defendant's principal contention is that the Commonwealth failed to exclude the possibility that the murder was committed by a third person and that its evidence was insufficient in law to prove that the atrocious murder was committed by Mrs. Kravitz. This contention is devoid of merit. All of the combined circumstantial evidence, considered as a whole, was amply sufficient to justify a jury in finding that defendant had murdered her husband.

All of the contentions of this defendant, sur her motion in arrest of judgment, have been made to and been rejected by this Court in many prior cases. In *Commonwealth v. Sauders*, 390 Pa. 379, 134 A. 2d 890, defendant had left their common home between 9:30 and 10:00 o'clock on the evening of May 3, 1955. The victim's body was found at 2:00 p.m. on May 4th. The coroner testified that in his opinion the death occurred somewhere between 8 and 20 hours before the body was discovered. There were no eyewitnesses of the killing, which could have been committed by any unknown person. This Court sustained the jury's verdict, which found defendant guilty of murder in the first degree and said (pages 387-388) :

"In Commonwealth v. Bolish, 381 Pa. 500, 113 A. 2d 464, the Court said (page 508) : '. . . Proof by eye witnesses or direct evidence of the corpus delicti or of identity or of the commission by the defendant of the crime charged is not necessary. ". . . It is clearly settled that a man may be convicted on circumstantial evidence alone, and a criminal intent may be inferred by the jury from facts and circumstances which are of such a nature as to prove defendant's guilt beyond a reasonable doubt: Commonwealth v. Kloiber, 378 Pa. 412, 106 A. 2d 820; Commonwealth v. Homeyer, 373 Pa. 150, 94 A. 2d 743; Commonwealth v. Lowry, 374 Pa. 594, 600, 98 A. 2d 733; Commonwealth v. Danz, 211 Pa. 507, 60 A. 1070; Commonwealth v. Wentzel, 360 Pa.

137, 61 A. 2d 309": Commonwealth ex rel. Garrison v. Burke, 378 Pa. 344, 348, 106 A. 2d 587.'" See also to the same effect: *Commonwealth v. Boden*, 399 Pa., supra; *Commonwealth v. Nasuti*, 385 Pa. 436, 123 A. 2d 435; *Commonwealth v. Carey*, 368 Pa. 157, 82 A. 2d 240.

In *Commonwealth v. Homeyer*, 373 Pa., supra, the Court sustained the verdict of a jury finding defendant guilty of murder in the first degree, with penalty fixed at death. On March 28, or March 29, 1950, the victim died of suicide or was murdered in their marital residence in Factoryville, Wyoming County, Pennsylvania. A year later (on March 7, 1951), a well preserved head identified as that of the victim was found encased in concrete in the defendant's home. There were no eyewitnesses of the killing. Defendant contended that his wife died of an overdose of sleeping pills; that upon discovering her body he was seized with panic and decided to dismember it; and that the dismemberment of her body after she was dead did not constitute any crime. The Court pertinently said, pages (156-157):

"The Commonwealth has the burden of proving beyond a reasonable doubt a wilful, deliberate and premeditated killing in order to constitute murder in the first degree. The Commonwealth in such a case, in order to establish the corpus delicti, must prove (1) that the alleged victim is dead, and (2) that the death occurred as a result of a felonious act. The corpus delicti, like other facts, may be shown by circumstantial evidence; *it is sufficient if these circumstances are consistent with crime even though they are also consistent with suicide or accident;** if it were otherwise it would be impossible in many cases, where there were no eye witnesses, to convict a criminal. Commonwealth v. Gardner, 282 Pa. 458, 128 A. 87; Commonwealth v.

---

* Italics throughout, ours.

Turza, 340 Pa. 128, 16 A. 2d 401; Commonwealth v. Johnson, 162 Pa. 63, 29 A. 280; Commonwealth v. Coontz, 288 Pa. 74, 135 A. 538; Commonwealth v. Bishop, 285 Pa. 49, 131 A. 657; Commonwealth v. Jones, 297 Pa. 326, 146 A. 905; Commonwealth v. Lettrich, 346 Pa. 497, 31 A. 2d 155.

"In the leading case of Commonwealth v. Gardner, 282 Pa., supra, the Court said (page 462) : 'In all criminal proceedings it is incumbent on the Commonwealth to establish beyond a reasonable doubt three elements: (1) the occurrence of an injury or loss,—in homicide, a person deceased; (2) a criminal agency,—in homicide, for example, that the death was caused by a beating, gunshot or circumstances indicating a felonious act (these two combined show a crime has been committed by someone) ; (3) that the defendant is the responsible party. Defendant contends that the crime for which he is charged was not committed. . . . The person for whose death a prosecution is instituted may be alive, so evidence that he or she is in fact dead is imperative. As death may have resulted from a cause other than a felonious act, there must be evidence that it occurred under circumstances which point to the commission of a crime. In this manner the corpus delicti is shown. . . . 4 Wigmore, Evidence, 2d ed., sec. 2072, pp. 410, 412; Grant v. Com., 71 Pa. 495, 505; Johnson v. Com., 115 Pa. 369, 391; Cox v. Com., 125 Pa. 94, 102; Com. v. Bell, 164 Pa. 517; Com. v. Russogulo, 263 Pa. 93, 108. . . . It sometimes happens the circumstances attending the act may be consistent with crime, suicide or accident. In such cases, the corpus delicti is proven where the circumstances attending the death are consistent with crime, though they may also be consistent with accident (Commonwealth v. Johnson, 162 Pa. 63), or suicide (Zell v. Com., 94 Pa. 258), and it is not necessary to show by affirmative proof that the latter two possibilities do not exist before evi-

dence as to who did the act is admitted: Com. v. Puglise, supra, 238.' "

In *Commonwealth v. Carey*, 368 Pa., supra, this Court sustained a verdict of guilty of murder in the first degree, with penalty fixed at death, and said (page 163) : "Defendant complains that there was no testimony that anyone saw him shoot and kill the victim; that no gun was found in his possession and that evidence of the actual killing by defendant was wholly circumstantial and insufficient in quality. He assigns as error the court's refusal of the fifth point of charge that *the quality of circumstantial evidence must be 'such as to exclude every other reasonable possibility, except that of guilt.'\** The trial judge properly refused to so charge.*"

*Commonwealth v. Danz*, 211 Pa., supra, was a famous case. Danz died June 27, 1901. On March 12, 1903, nearly two years later, his body was exhumed and the coroner's physician made a post-mortem examination. He testified that he found arsenic in various organs of Danz's body in weighable quantities. Three experts testified that they were of the opinion that death had been caused by arsenic poisoning, even though arsenic is rapidly eliminated from the system, and even

---

\* This theoretical refinement, like the statement found in earlier cases, viz., that "the facts and circumstances must be inconsistent with his innocence" was not only confusing to juries, but was illogical, unsound and irreconcilable with other decisions of the Court. At the suggestion of President Judge KELLER it was repudiated and abandoned by this Court. See, inter alia: *Commonwealth v. Grosso*, 169 Pa. Superior Ct. 606, 84 A. 2d 239; *Commonwealth v. Sauders*, 390 Pa., supra; *Commonwealth v. Rogozinski*, 387 Pa. 399, 128 A. 2d 28; *Commonwealth v. Nasuti*, 385 Pa., supra; *Commonwealth v. Kloiber*, 378 Pa., supra; *Commonwealth v. Homeyer*, 373 Pa., supra; *Commonwealth v. Carey*, 368 Pa., supra; *Commonwealth v. Wentzel*, 360 Pa. 137, 143, 61 A. 2d 309; *Commonwealth v. Holt*, 350 Pa. 375, 39 A. 2d 372; *Commonwealth v. Libonati*, 346 Pa. 504, 508, 31 A. 2d 95; and other cases hereinabove cited.

though the Commonwealth failed to prove that a quantity of poison sufficient to cause death was found in the deceased's body. The Commonwealth also proved that defendant and her husband Danz quarreled frequently; that she stated to some of the witnesses that she would be happier if he were dead; to one she repeatedly said that she would like to get rid of him; that he accused her of trying to poison him; and that she had stated "To Mrs. Heinel . . . that she had put the powders Hossey had given her into her husband's coffee, and that the son-of-a-bitch had discovered it and thrown it out, but she would catch him yet." Defendant denied that she had ever given her husband any arsenic; she proved that the embalmer inserted arsenic in the body of the deceased; and she likewise proved by distinguished experts that her husband had not died from arsenic poison. Defendant contended, inter alia, that the Commonwealth was unable to prove any motive, but the Court accurately said that proof of motive is unnecessary. Nevertheless, on the basis solely of the circumstantial and conflicting evidence hereinabove summarized, this Court sustained a jury's verdict of guilty of murder of the first degree.

Under the aforesaid authorities, it is clear that the evidence produced by the Commonwealth not only would adequately, but amply, justify a jury in finding defendant guilty of murder in the first degree.

While defendant in her appeal brief of 115 pages concedes that the law is that which is hereinbefore set forth, she nevertheless contends *in effect* that there must be proof by eyewitnesses that she committed the crime charged, or, as she sometimes expresses it, that the Commonwealth has to exclude the possibility that some third party committed this murder. Careful consideration, analysis and all the hereinabove quoted and cited decisions of this Court demonstrate that this is not the law. If eyewitness testimony of the commission

of a murder were necessary, or if the Commonwealth had to exclude the possibility of a third person committing the crime—which would, in reality, require an eyewitness or the capture of defendant "red-handed"—few murderers would ever be convicted, and society could not possibly be adequately protected. Moreover, even if a defendant was caught running away from the murder scene right after the murder, he would have to be acquitted under the "exclusion" theory because he could contend that he was running away in order to avoid suspicion or to escape from the unknown criminal's attempt to murder him. In the *Sauders* case, in the *Bolish* case, in the *Homeyer* case, in the *Wentzel* case, in the *Danz* case, in the *Boden* case, in the *Carey* case, and in *Commonwealth v. LaRue,* 381 Pa., infra (to mention just a few) there were no eyewitnesses to the murder; the exact time of death was unknown; and any third party or unknown person could have committed the murder. Any refinements or distortion of the law such as defendant urges would not only require us to overrule a myriad decisions of this Court, but would make the protection of society in most cases realistically impossible.

Defendant relies chiefly upon *Commonwealth v. Bausewine,* 354 Pa. 35, 46 A. 2d 491, which on its facts is clearly distinguishable. In that case the defendant was indicted for bribery. The Court discharged him because the Commonwealth's evidence was so weak and inconclusive, and the surrounding facts and circumstances* demonstrated that no jury could justifiably have found defendant guilty beyond a reasonable doubt of the crime charged. However, the Court recognized the applicable and well settled principles of law (page 41) : "The facts and circumstances proved must, in or-

---

* Defendant's actions and statements likewise disclosed his innocence.

der to warrant a conviction, be such as to establish the guilt of the defendant, *not . . . as being absolutely incompatible with his innocence,* but at least beyond a reasonable doubt." This statement of the law was repeated in *Commonwealth v. LaRue,* 381 Pa. 113, 112 A. 2d 362. In that case the victim was found dead in her bedroom with numerous fatal stab wounds in her body. The evidence of the Commonwealth linking defendant to the crime was circumstantial. Defendant denied that he had stabbed the victim and produced evidence suggesting that deceased had committed suicide, or that the victim was stabbed by her son who admitted he ran into her room as soon as he heard his mother scream. This Court sustained a conviction of murder in the first degree with penalty of death.

*Commonwealth v. Wentzel,* 360 Pa., supra, and *Commonwealth v. Rogozinski,* 387 Pa., supra, which are relied upon by defendant, support the Commonwealth, not the defendant. In the *Wentzel* case, this Court sustained a jury's verdict that defendant was guilty of murder in the second degree. *There were no eyewitnesses, the time of the crime was unknown, and anyone of many persons could have committed the murder.* Miriam Green was found dead in her first floor apartment in Pottstown shortly before 2:00 o'clock on the afternoon of *December 9,* 1946. A blue scarf was tied around her neck. A screen and a metal grating on the outside of the bedroom window had been removed; the front door and the bedroom window were open, so it is clear that one or many persons could have entered and committed the murder. The coroner pronounced the victim dead from strangulation, and it was his opinion that she had been dead for a period of not more than 12 hours. Defendant, a married man, residing with his wife and child, was arrested in Pottstown at about 7:30 on the evening of December *9th,* the day Miriam's body was found. Defendant admitted,

inter alia, that he had gone to her apartment at *11:00 o'clock* on the night of December *8th,* gained entrance with a key which she had given him, and upon turning on the light discovered her dead body. He denied he had anything whatever to do with her death. Defendant produced witnesses who testified that Miriam was killed *two days prior to December 8th,* and also proved an alibi from the late afternoon of December 5th until his visit to Miriam's apartment at 11:00 o'clock on Sunday night, December 8th, when he discovered Miriam's dead body. The Court said (page 143) : "While none of the facts presented would be conclusive of his guilt when individually considered, yet there is no doubt in our minds that the evidence presented, *when considered collectively,* required that the case be submitted to the jury.

". . . '. . . ". . . Circumstantial evidence is, in the abstract, nearly, though perhaps not altogether, as strong as positive evidence; in the concrete, it may be infinitely stronger." See also Commonwealth v. Kovovic, 209 Pa. 465, 468; Commonwealth v. DuBoise, 269 Pa. 169, 174; Commonwealth v. Karmendi, 328 Pa. 321, 333. . . .' "

In *Commonwealth v. Rogozinski,* 387 Pa., supra, this Court sustained a jury's verdict of guilty of murder in the first degree where there were no eyewitnesses, but defendant had been within a 20 minute walk of the victim's room at the time he was probably murdered. The Court said (pages 402-403) : " 'The requirement of the law is that in order to warrant a conviction the facts and circumstances proved must be of such character as to . . . [prove] the guilt of the accused beyond any reasonable doubt—*not that they need be absolutely incompatible with his innocence*—and that doubt is for the jury unless the evidence "be so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances".': Com-

monwealth v. Libonati, 346 Pa. 504, 508, 31 A.. 2d 95. As in the case of Commonwealth v. Wentzel, 360 Pa. 137, 147, 148, 61 A. 2d 309, 'To hold that the evidence here presented did not warrant the submission of this case to the jury would be almost tantamount to a complete elimination of convictions based entirely upon circumstantial evidence, however strong and conclusive.' "

## Trial Errors

Defendant contends that certain testimony of Mrs. Frances Robinson was inadmissible. Mrs. Robinson, a neighbor and friend of defendant, testified that in the Spring of 1958 Mrs. Kravitz, after pledging her to secrecy, told her on a number of occasions that she found life with decedent unbearable and she wanted a divorce and had retained a lawyer in order to get one.* She also testified that she had made two wills for defendant, the last being as recent as the Spring of 1958, and in neither will did she leave anything to her husband.

Evidence to prove motive, or intent, or plan, or design, or ill will or malice is always admissible: *Commonwealth v. Boden,* 399 Pa. 298, 159 A. 2d 894; *Commonwealth v. Homeyer,* 373 Pa. 150, 94 A. 2d 743; *Commonwealth v. Novak,* 395 Pa. 199, 150 A. 2d 102; *Commonwealth v. Patskin,* 372 Pa. 402, 93 A. 2d 704, and cases cited therein; *Commonwealth v. Peyton,* 360 Pa. 441, 62 A. 2d 37; *Commonwealth v. Malone,* 354 Pa. 180, 47 A. 2d 445; *Commonwealth v. Jones,* 269 Pa. 589, 113 A. 57; *Commonwealth v. Danz,* 211 Pa. 507, 60 A. 1070.

In *Commonwealth v. Novak,* supra, the Court said (page 204): " 'Evidence to prove motive, intent, plan or design are admissible [citing cases].' : Commonwealth v. Homeyer, 373 Pa. 150, 159, 94 A. 2d 743. However, 'proof of motive is always relevant but never neces-

---

* Mrs. Robinson's reputation was attacked by defendant but she was corroborated in several parts of her testimony.

sary.': Commonwealth v. Malone, 354 Pa. 180, 188, 47 A. 2d 445."

In *Commonwealth v. Boden,* 399 Pa., supra, the Court, quoting from *Commonwealth v. Peyton,* 360 Pa., supra, said (page 305) :

" '. . . " 'In almost any situation—whether the fact of killing is denied, or whether self-defense is pleaded, or whether it is contended that by reason of provocation the killing is reduced to manslaughter—proof of the previous relations of the prisoner and the deceased, whether friendly or hostile or whatnot, is relevant and competent.' " ' See also : Commonwealth v. Giacobbe, 341 Pa. 187, 19 A. 2d 71 ; Commonwealth v. Del Giorno, 303 Pa. 509, 154 A. 786 ; Hester v. Commonwealth, 85 Pa. 139 ; McManus v. Commonwealth, 91 Pa. 57 ; McMeen v. Commonwealth, 114 Pa. 300, 306, 9 A. 878 ; Commonwealth v. Minoff, 363 Pa. 287, 69 A. 2d 145, . . . ."

Mrs. Robinson's testimony was undoubtedly admissible under the aforesaid authorities.

Conflicting or contradictory or false statements of the defendant, for example as to her use of Bovung and watering her rosebed that afternoon, and particularly as to the *route* she took to the Passon home, were admissible, "since the jury may infer therefrom that they were made with an intent to divert suspicion or to mislead the police or other authorities, or to establish an alibi or innocence, and hence are indicatory of guilt." *Commonwealth v. Sauders,* 390 Pa. 379, 388-389, and a dozen cases cited therein. The route taken by defendant to the nearby Passon home shortly after the murder was particularly important because the gun was found in a culvert along this route.

Defendant contends that the trial Court erred in refusing to separate and sequester the police officers and detectives who were Commonwealth's witnesses. In nearly every criminal and civil case, one side or the

other would like to have some or all of the witnesses of his opponent sequestered. The lack of adequate room space, the long delays which would inevitably be caused by sequestration and other practical considerations, make sequestration of witnesses ordinarily impractical or inadvisable, except in unusual circumstances.* For the foregoing reasons the question of sequestration of witnesses is left largely to the discretion of the trial Judge and his decision thereon will be reversed only for a clear abuse of discretion.

In *Commonwealth v. Turner*, 371 Pa. 417, 429, 88 A. 2d 915, the Court said: "In Pennsylvania it has long been established that the trial judge has the power to permit sequestration of witnesses: Commonwealth v. Principatti, 260 Pa. 587 at 598, 104 A. 53; and that it is a matter within the discretion of the trial judge: Commonwealth v. Sloat, 298 Pa. 10, 147 A. 834."

The lower Court convincingly explained its reasons for refusing to order a sequestration of the police officers. We find no abuse of discretion in the trial Judge's refusal of sequestration.

Defendant contends that the trial Judge committed a reversible error in explaining to the jury that they should ignore a statement made (in good faith) by the District Attorney, viz., that he would prove that defendant had refused to take a blood test. The trial Judge subsequently held such testimony to be inadmissible. The trial Judge wisely, fairly and exceptionally ably charged the jury on this point. The District Attorney contends that this evidence should have been admitted but that if the trial Judge erred, his error was harmless and was certainly cured in and by the Judge's charge. In *Commonwealth v. Musto*, 348 Pa. 300, 35 A. 2d 307, former Chief Justice STERN, speaking for the

---

* A request for sequestration of a witness or witnesses should be specific and should be supported by some reason or reasons demonstrating that the interests of justice require it.

Court, said (pages 306-307) : ". . . the constitutional immunity from self-incrimination does not apply to a compulsory examination to determine the prisoner's physical or mental condition for the purpose of testifying in regard thereto, provided, of course, that he be not compelled to answer any questions propounded to him by those making the examination. [Citing many cases]. The purpose of the constitutional provision is to prohibit the *compulsory oral* examination of the prisoner either before or at trial,—to prevent his being required to incriminate himself by speech or the equivalent of speech : Commonwealth v. Valeroso, 273 Pa. 213, 219, 220, 116 A. 828, 830. 'The prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material.' : per Mr. Justice HOLMES in Holt v. United States, 218 U. S. 245, 252, 253. 'Not compulsion alone is the component idea of the privilege, but *testimonial* compulsion . . . . Unless some attempt is made to secure a communication, written or oral, upon which reliance is to be placed as involving his consciousness of the facts and the operations of his mind in expressing it, the demand made upon him is not a testimonial one' : 8 Wigmore on Evidence (3d ed.) 375, sec. 2265."

Prior and subsequent decisions have likewise interpreted and limited the constitutional immunity from self-incrimination to speech, or the equivalent of speech, as former Chief Justice STERN so clearly said in *Commonwealth v. Musto,* supra. For example, in *Commonwealth v. Fletcher,* 387 Pa. 602, 128 A. 2d 897, the District Attorney was permitted to call the jury's attention to defendant's peculiar manner of walking, even though defendant had not taken the witness stand.

In *Commonwealth v. Statti,* 166 Pa. Superior Ct. 577, 73 A. 2d 688, the Court held that "certainly one

lawfully arrested may not refuse to submit to finger printing, nor to a search of his person. So also the constitutional privilege does not allow a defendant to refuse a witness the opportunity of seeing him and hearing his voice, for the purpose of identification. Cf. Johnson v. The Commonwealth, 115 Pa. 369, 395, 9 A. 78. The privilege did not prevent the Commonwealth from requiring some of the defendants to stand in the presence of the jury, as they were identified by a witness in Commonwealth v. Safis et al., 122 Pa. Superior Ct. 333, 186 A. 177."*

In *Commonwealth v. San Juan*, 129 Pa. Superior Ct. 179, 183, 195 A. 433, the Court held that the "person" of a defendant may be offered in evidence without violating his constitutional privilege of immunity.

In *Commonwealth v. Tunstall*, 178 Pa. Superior Ct. 359, 363, 115 A. 2d 914, the Court held that "The instruments or devices of crime found upon the person of one charged with crime are legitimate evidence and may be taken from a defendant and used for that purpose. Com. ex rel. v. Keister, 289 Pa. 225, 229, 230, 137 A. 223. Evidence in the form of number slips taken from a defendant's pocket and hat band has been held admissible. Com. v. Adams, 174 Pa. Superior Ct. 504, 102 A. 2d 202. In the present case the evidence admitted [number slips removed by force from defendant's mouth] was not obtained as the result of any procedure which shocks the conscience or violates appellant's fundamental constitutional rights."

Notwithstanding the general rule and the foregoing authorities, we believe that blood tests are not yet suf-

---

* Cf. also *Breithaupt v. Abram*, 352 U. S. 432—the introduction of blood taken from the defendant without his consent and while he was unconscious was held not to violate the Federal Constitution; also *Commonwealth v. Gunear*, 76 Pa. Superior Ct. 311—tone of voice, and compelling accused to wear a cap alleged to have been worn by one of the robbers.

ficiently scientifically determinative, or of such clear
probative proof as to justify compelling a defendant in
a murder case to submit thereto against his will. It
follows that the trial Judge correctly refused the Dis-
trict Attorney's offer of proof that Mrs. Kravitz had
refused to permit a blood test. However, the trial Judge
in his charge wisely and clearly explained to the jury
that the District Attorney's opening remarks should be
ignored, and this charge rendered harmless the District
Attorney's remarks which were made in good faith.
Cf. *Com. v. Neill*, 362 Pa. 507, 517, 67 A. 2d 270.

Defendant moved for a new trial on the basis that
two jurors some two months after the verdict swore
that a tipstaff had discussed the case with six jurors
although what was allegedly said was unknown. The
tipstaff and the six jurors denied this. Four Judges
constituting a Court en banc interviewed the jurors and
heard their testimony and permitted cross-examination.
The lower Court in dismissing defendant's motion, said:
"If the tipstaff discussed the testimony with the jurors,
it was improper. It was his duty, under the law and
his oath, not to discuss the case or the testimony with
any of them, so that the jurors may perform their du-
ties without hindrance or suggestion from any source.
But we have no difficulty in finding that the male tip-
staff did not discuss the testimony with any of the
jurors in this important case and is free from any mis-
conduct or breach of his solemn oath.

"When we come to consider the testimony of the two
accusing jurors, we must bear in mind the conditions
under which the affidavits were procured. The eager
lady reporter tried to take two lady jurors home after
the trial. She found her way into the woman's dormi-
tory. Two months after the verdict, she interviewed
eight jurors asking leading and searching questions with
a view of finding some irregularity. She harassed and
annoyed several jurors until they called upon the Dis-

trict Attorney.* She told one juror that she had certain affidavits, which she did not have. She finally found two elderly jurors, one hard of hearing, and prevailed upon them to make affidavits at the office of defense counsel. No one knows what leading or suggestive questions she posed to these jurors, who had an opportunity all through the trial, at the verdict, when the jury was polled, and for some months later, to complain to the Court, yet they never did. The testimony of these two jurors is vague, indefinite, uncertain, and flatly contradicted. Neither can state what was said, or what witnesses' testimony was repeated. They do not state that the tipstaff talked to them directly, but that they overheard him discussing the case with other jurors. All six other jurors deny any discussion and also the tipstaff himself. Furthermore, there is direct testimony of five jurors, who testify that the tipstaff announced that he was not permitted to discuss the case or answer questions.

"The testimony of Mrs. Adams, that Mr. Hunsicker and Mrs. Blair were in the television room and heard the tipstaff discuss the case, is flatly denied by Mr. Hunsicker and Mrs. Blair. The testimony of Mr. Hunsicker that he complained to the forelady and Mrs. Blair, is denied by the forelady and Mrs. Blair. It is apparent that these two accusing jurors are mistaken and are believing something that did not actually occur. We cannot believe these two jurors, in contradiction to six jurors and a tipstaff, in order to grant, what some people desire, a new trial."

In *Commonwealth ex rel. Darcy v. Claudy*, 367 Pa. 130, 79 A. 2d 785, the Court said (page 133-134) : "The petition alleges that some of the jurors have recently

---

* In fairness to the reporter, she was not called upon by the Court to deny or explain her actions which were seemingly outrageous.

been interviewed and have stated that, if relator had taken the witness stand in his own defense or if his counsel had produced evidence of good reputation prior to his association with his co-defendants, they would have fixed the penalty at life imprisonment instead of death. The practice of interviewing jurors after a verdict and obtaining from them ex parte, unsworn statements in answer to undisclosed questions and representations by the interviewers *is highly unethical and improper* and was long ago condemned by this Court in Cluggage v. Swan, 4 Binney 150, 158 (1811), reiterated and reaffirmed in Friedman v. Ralph Bros., Inc., 314 Pa. 247, 249, 171 A. 900, 901, and again quoted from at length in Redmond v. Pittsburgh Railways Company, 329 Pa. 302, 303-304, 198 A. 71, 72. *It is forbidden by public policy*: Commonwealth v. Greevy, 271 Pa. 95, 99, 114 A. 511, 512. Certainly such post-trial statements by jurors are not to be given any weight on even an application for a new trial, much less a petition for a writ of habeas corpus." We find no error or abuse of discretion in the lower Court's rejection of this motion for a new trial.

Mrs. Kravitz did not take the witness stand. Her defense consisted of a dozen witnesses who testified as to her good reputation; two witnesses who testified that Mrs. Robinson had a bad reputation; two witnesses who testified that they never saw or knew Max Kravitz to have a gun; a witness who testified that Mrs. Kravitz had a solid-colored dress on when she answered the doorbell the day of the murder; an expert who testified as to the time of death; and four witnesses who participated in a test for gun sound. The defense also vigorously attacked the Commonwealth's witnesses, and vigorously argued the weaknesses or conflicts in the Commonwealth's case.

In this Court defendant's case was ably argued —every fact or circumstance which might indicate

Mrs. Kravitz's innocence, and every actual or imaginable weakness or omission in the Commonwealth's case was skillfully pointed out; and every legal point which had any possible or conceivable merit was persuasively presented to convince this Court that Mrs. Kravitz was innocent, or that in any event she should be granted a new trial.

We have carefully considered all of defendant's authorities and all of defendant's contentions. We find the former inapposite and the latter without merit. We are convinced that the mass of circumstantial evidence produced by the Commonwealth, when considered collectively, was not only legally sufficient, but was more than amply sufficient to prove beyond a reasonable doubt that this was a first degree murder and that it was committed by this defendant. We are also convinced that defendant had a very fair trial and that there was no reversible error.

Judgment and sentence affirmed.

Mr. Justice COHEN concurs in the result.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Mrs. Ethel Kravitz, the defendant in this case, was found guilty of murder in the second degree on the charge of having killed her husband. The verdict was based entirely on circumstantial evidence which, the defendant contends, fell short of proving her guilty beyond a reasonable doubt.

There are indeed features in the case which might well disturb the inquiring mind as to whether justice has been done. If the transcript of the record showed that all rules of proper criminal procedure were punctiliously adhered to, and that all irrelevancies which might mislead the fact-finding tribunal were scrupulously excluded, and that the jury was instructed in words of living light as to their duties and responsi-

bilities, one would have to say that the accused was afforded every right under the Constitution and that, therefore, the verdict must be accepted as due process of law.

Unfortunately, the transcript does not show that kind of a trial. Without intending to suggest that anyone was motivated by a thought other than seeking to achieve a just and proper verdict, I am constrained to say that the hand which held the helm allowed it occasionally to slip away and, as a consequence, the craft bearing the accused was swept into treacherous waters and finally landed on a shore which no one can say with unquestioning assurance was the proper destination.

Since there were no eyewitnesses to the killing, which was the subject of the trial, the presiding judge should have been exceptionally careful not to allow anything to come into the proceedings which might set up a false standard for the jury's deliberations. Whether such a standard was raised depends upon an understanding of the facts which, briefly, were as follows.

On the afternoon of July 4, 1958, at 4:50 p.m., the body of Max Kravitz, with bullet wounds and many lacerations inflicted by some instrument, was found in the marital bedroom of his home at 1250 Knox Road, Wynnewood, Montgomery County. Furniture, draperies, clothing and walls of the room were bespattered with blood.

Mrs. Kravitz was in the house at the time. There was no evidence as to when the fatal bullets were fired and the blows struck. In mid-afternoon of that day, a neighbor (305 feet away), Paul MacMurray, had heard the breaking of glass in the Kravitz house. He ran to it and, while there, heard a man's loud voice utter three unintelligible words. He returned to his home and called the police who immediately appeared at the Kravitz home and asked Mrs. Kravitz, who came to the door of the house, whether everything was all

right. She said that everything was all right. The police left.

At 4 p.m., Mrs. Kravitz drove to the home of her sister-in-law, Mrs. Esther Passon, who lived from one-fourth to one-half a mile away, to deliver some flower pots (both families were interested in gardening) and then returned to her home with Mr. Passon, to whom she was to give some gardening implements. They came to the Kravitz home at about 4:50 p.m. It was then that the dead body was discovered.

The Commonwealth argues, in support of the verdict, that the defendant was the only one in the Kravitz house during the time that the killing occurred and that, therefore, only she could have committed the dreadful deed. But the witnesses the Commonwealth presented did not exclude the possibility that someone else could have entered the house during the crucial hours. It was a summer's day. The garage door was open at 2:50 p.m. The defendant was admittedly away from the house between 4 and 4:50 p.m. When she and Mr. Passon came to the house at the latter hour, the front door, according to Mr. Passon, was open. In fact, when the police arrived in answer to his call, he told them, as the district attorney concedes in his brief, that "robbers had performed the deed."

The Commonwealth maintains that the defendant planned to kill her husband, but produced no evidence to substantiate this alleged intention. It did show through a witness, Mrs. Frances Robinson, that the defendant "wanted to get a divorce." A wife may very much desire to be permanently separated from a man she had once loved without desiring that the separation take place in a cemetery. The statistics sorrowfully announce that nearly one out of every four marriages ends in divorce. One could not say on this basis that 25% of the spouses (one or the other) engenders the desire to murder the opposing mate.

Mrs. Robinson also testified that she had drafted two wills for Mrs. Kravitz in which the testatrix left nothing to Max Kravitz. Here again a woman may want to disinherit her husband and yet not want to bludgeon him to death. Such a disinheriting (if factually and legally verifiable) would not have seriously affected Mr. Kravitz economically since he was wealthy in his own right. But what possible connection could this will-writing have with an intent to murder? Mrs. Kravitz's will would be absolutely meaningless at the time of the death of Mr. Kravitz. Her will would be effective only when *she* died! And certainly there was no evidence that she would kill herself in order to spite her husband.

Mrs. Robinson also testified that Mrs. Kravitz said: "Max is simply impossible; I cannot put up with this foolishness. Now he won't eat in the kitchen." What Mrs. Kravitz intended to gain by her husband eating in the kitchen was not developed in the testimony but whatever that hypothetical advantage could have been to her, its lack of fulfillment could scarcely have provoked her to the extent that she would murder him in cold blood.

The Commonwealth contended that the weapon which killed Max Kravitz was a 38 calibre U. S. revolver which was found concealed in a culvert located on the route assumed to have been traveled by Mrs. Kravitz when she went to visit the Passons. There was no evidence that this revolver[1] belonged to Mrs. Kravitz, that she ever used it, or was familiar with it in any way. It reputedly belonged to the victim's father.

The Commonwealth accepted 2:47 p.m. as the time Mr. McMurray heard the crashing of glass. Its brief

---

[1] Both the Commonwealth's brief and defense counsel's brief repeatedly refer to the murder weapon as a "gun." This tiresome misuse of a word is almost inexcusable. The weapon in this case was a revolver not a gun.

then goes on to say: "It is inescapable that this victim did the summoning by breaking the window panes. It was when he did this that the defendant realized her horrible mistake in assuming that he was dead. It was then that she took the butt end of the revolver and smashed it over the victim's head, and, when the gun grips broke, she then used her hand mirror to complete this wicked killing.

"This victim fell with his feet toward the window and his head toward the bed. All the blood on the rug was centered about the immediate area where his body was found. This was where he committed his final thrashings of life as he was being bludgeoned."

But the Commonwealth admits that Mrs. Kravitz appeared at the door of her home nine minutes later, properly clothed, her hair undisheveled, and giving no evidence of having engaged in the fearful and bloody violence described. In fact, the Commonwealth was to argue later that she was "cool, calm, and collected," to demonstrate that she was the kind of a person who could have premeditated and executed so dastardly and sanguinary a crime. But no matter how cruel and calloused a woman might be, she would not have had time to brandish the revolver as a club, using it so many times that its grips broke, then to ply a hand mirror until it smashed, change her clothes, wash off all marks of blood, and appear in the door "cool, calm, and collected"—all in nine minutes.

The Commonwealth contends further that a blouse, some slippers and shoes belonging to her were found in the master bedroom bearing droplets of blood. But this circumstance is not evidence of guilt since Mrs. Kravitz shared the bedroom with her husband and the clothes belonging to her would normally be in that room.

The Commonwealth points out, in further support of its thesis of guilt, that although Mrs. Kravitz wept

after the death of her husband, she never shed tears, but not every grief-stricken woman becomes a Niobe.

All these incidents, observations and coincidences relied upon by the Commonwealth could still be substantial accusatory items of guilt which would require strong evidence of exculpation on the part of the defendant, if the stream of the trial leading to an acceptable verdict had not been unintentionally diverted and unwittingly muddled by erroneous rulings on the part of the trial court.

In his opening remarks to the jury the district attorney said: "We will show you, members of the jury, that the defendant was taken to the Bryn Mawr Hospital for a blood test, and she refused to submit to a blood test." Defendant's counsel objected to this statement, even before it was made, anticipating what the district attorney would say, and he moved for withdrawal of a juror after it was made. The judge overruled the objection and refused the motion.

Although no evidence was presented to show that Mrs. Kravitz had refused to take a blood test, the Commonwealth never retracted its statement that she had so refused. Thus for eleven days, the duration of the trial, the jury was allowed to believe that Mrs. Kravitz, out of fear of divulging some evidence of guilt, had refused to give up a specimen of blood. The statement by the district attorney made the defendant suspect at the very beginning of the trial, and it is possible that all evidence which followed was interpreted by the jury as confirming the suspicion which was not based on any proved fact. Once a sky gazer assumes that the clouds in the celestial heights form the shape of a camel, every stray and fragmentary shred of mist in that vaulted area becomes part of the predetermined image.

The district attorney undoubtedly did not intend to take advantage of the defendant, but the fault was a

serious one and should have been corrected by the judge at once. The judge later realized his error in not having excluded the statement, but in an attempt to correct the situation he shook the issue out of the frying pan of error into the fire of outright condemnation. When he came to charge the jury, the Judge said: "To this statement in the opening address, defense counsel took objection and at that time the trial judge overruled the objection. Later, during the trial, the trial judge refused to permit the Commonwealth to show *the defendant's refusal to give a blood sample.* In the opinion of the trial judge, *even though the defendant refused to give a sample of her blood to the police,* such a refusal is not competent evidence, against her to show a conscienceness of guilt, because of the constitutional provision that, 'no person accused of crime, shall be compelled to be a witness or to give evidence against himself, and such provisions render incompetent all evidence incriminating the accused, which he is compelled to produce.'

"In this case, she had the privilege against self-incrimination affording her protection, which is to be construed liberally, *to prevent compulsory self-incrimination.* If the police or doctors took her blood by force and compulsion, such evidence would be inadmissible, and against due process of law.

"I, therefore, charge you, members of the jury, that *the defendant's refusal to submit to a blood typing test, if she did object,* should not, and cannot, be commented upon to the defendant's prejudice, *because she had a right to refuse* and no inference prejudicial to the defendant should be drawn by the jury from such alleged refusal.

"It is not to be considered by you, as evidence of conscienceness of any guilt, *as she had a legal right to refuse.* Therefore, please, erase from your minds, and forget the district attorney's opening statement in this

regard, in considering this case, and pass upon the case as if there was no statement that *this defendant refused to furnish a blood typing sample. If she did refuse, she had a legal right to do so,* and she must not be prejudiced in any manner by such statement. Please, therefore, blot out and erase from your minds, *this alleged request for a blood sample to be taken from the body of the accused.* It has no place in your consideration in the case." (Emphasis supplied.)

It will be noted here that in telling the jury that Mrs. Kravitz had the right to refuse a blood test, he practically told the jury that she in fact *had refused.*[2] In point of realism, however, the question for the jury was not whether Mrs. Kravitz could legally decline a blood test, but whether, in fact, she did decline to take the test, for, if she refused to furnish a blood typing sample, this would show that she feared the sample would show her to be guilty. Hence this kind of a refusal could be interpreted as an admission of guilt because, if innocent, she would not fear a blood test or any test.

Let us give an illustration. Suppose the district attorney had said to the jury: "We have a confession from the defendant in which she admits committing the murder." Let us suppose that, later on, the court ruled that the confession was inadmissible because the defendant had not been advised of her constitutional rights in the matter. Would any instruction by the judge to disregard the district attorney's statement ever blot out from the minds of the jurors the proposition that the defendant had actually confessed?

Suppose the district attorney had said that the defendant refused to look at the dead body of her hus-

---

[2] With the exception of twice stating the matter in hypothetical form, the judge repeated over and over that Mrs. Kravitz refused to take the blood test.

band. And then suppose the trial judge had told the jury that she had the right not to look at his body and did not give the defendant an opportunity to explain why she had not looked or to say that she had in fact looked. Under those circumstances, would not the jury assume that she had refused to look at her husband out of a consciousness of guilt, or out of hatred, a hatred which had impelled her to his destruction?

It is thus plain that the district attorney's remark that Mrs. Kravitz refused to submit to a blood test became a stain on the robe of presumption of innocence which no exhortation on the part of the trial judge could wipe out.

The Majority of this Court supports the decision of the trial judge in this matter, but I respectfully submit that, in doing so, the Majority misses the whole point. The Majority Opinion argues at length that Mrs. Kravitz could have been compelled to submit to a blood test because, while the Constitution protects an accused from being compelled to utter words, it does not protect him from being compelled to utter blood. I do not think that this is the law, but even if it were, it has absolutely nothing to do with the issue. The damage done the defendant lay in the fact that the jury was allowed to take the district attorney's statement that Mrs. Kravitz had refused to take the blood test as established truth and then was given no chance to refute his statement.

The trial judge's charge on the subject of blood sampling was even more prejudicial to the defendant than already indicated. Before taking up the blood test episode, the judge said to the jury: "In seeking a motive, you may search the action, conduct and behavior of the defendant immediately before, during, and after the commission of the alleged offense, if she did it, and you may ask yourselves, whether such conduct was the conduct of an innocent or guilty person."

Thus, if the jury believed that Mrs. Kravitz refused to submit to the blood test (and they could not believe otherwise because she was not allowed to refute the charge) they were allowed to believe that this refusal was the conduct of a guilty person.

In view of the fact that the Commonwealth's case was a pyramid of circumstances with no eyewitnesses involved, the judge should have charged the jury to study the pyramid with extreme caution to determine whether it held together solidly or whether, by the simplest application of the force of logic, it would tumble to the ground of unconfirmed hypothesis. Instead of so or similarly charging, the judge practically invited the jury to guess at the solidity of the prosecution's structure. He said: "If after going over all of the evidence, and giving it your best consideration, you do not have a reasonable doubt of the defendant's guilt, then it is your solemn duty to convict. Please bear in mind, however, that it is not the duty and burden of the Commonwealth to prove or establish guilt beyond or beyond all possibility of doubt, or *prove it to an absolute certainty,* but only beyond that reasonable doubt as I have just defined that term to you." (Emphasis supplied).

When the judge said that in order to obtain a conviction the Commonwealth did not need to prove the defendant guilty to an "absolute certainty," he in effect said to the jury: "Before you can convict, you must be certain, but not absolutely certain." This is like saying that "we want the truth, but not necessarily the absolute truth." Why did the judge modify "certainty"? When he said that the Commonwealth had the burden of proving guilt beyond a reasonable doubt, and he defined reasonable doubt, he gave the jury the proper measuring rod to use in gauging the evidence, but when he said that the Commonwealth did not need to prove

its case to an absolute certainty, he splintered the measuring rod.

The Commonwealth was asking for a verdict of first degree murder with the death penalty. It is horrible to contemplate that in a civilized society the fact-finding tribunal would be allowed to send a person to his or her death on proof which is not absolutely certain.

The judge went further. He said: "The burden resting on the Commonwealth to prove its case beyond a reasonable doubt, does not require it to demonstrate the utter impossibility of innocence."

This was another invitation to the jury to be satisfied with a guess. Why was it necessary to conjure up fantasies as to what the Commonwealth was not required to do? Obviously, the Commonwealth was not expected to bring in a dozen angels to testify to the guilt of the defendant, but, by everything which is just, proper, and decent, the Commonwealth was required to remove the possibility of innocence before it could dare to place a person in the electric chair, because that is what the Commonwealth was asking be done. It is appalling to think that a person may be convicted of murder while there still exists the possibility that he or she may be innocent, but that is exactly what the judge told the jury they could do.

The judge played on this theme as if it were a harpsichord. He returned to it over and over. He said: "The requirement of the law is, that in order to warrant a conviction on circumstantial evidence, the facts and circumstances proved must be of such character as to produce a moral certainty of the guilt of the accused beyond a reasonable doubt, and such as reasonably and naturally justify an inference of guilt, and are of such volume and quality as to overcome the presumption of innocence and satisfy the Jury of the accused's guilt beyond a reasonable doubt. *It does not*

*require them to be absolutely incompatible with inno-
cence."* (Emphasis supplied).

Why shouldn't the facts and circumstances, in order
to warrant a verdict of guilty in a murder case, be ab-
solutely incompatible with innocence? The Judge's
statement in this regard would wipe out the rule of
reasonable doubt. If every circumstance introduced
against Mrs. Kravitz could be explained compatibly
with innocence, she would be entitled to an acquittal
because such equation of interpretation would inevita-
bly raise the reasonable doubt which would entitle the
defendant to an acquittal. This Court has spoken fre-
quently in direct opposition to what the judge told the
jury in this case. In the case of *Commonwealth v.
Benz,* 318 Pa. 465, 472, we said: "When a charge of
crime is sought to be sustained by circumstantial evi-
dence, the hypothesis of guilt should flow from the
facts and circumstances proved, and be consistent
with them all. The evidence must be such as to exclude
to a moral certainty every hypothesis but that of guilt
of the offense imputed; the facts and circumstances
must not only be consistent with and point to the guilt
of the accused, but they must be inconsistent with his
innocence."

I submit that the trial judge in the case at bar com-
mitted another serious error. He said to the jury: "If
the circumstances proved do not convince you beyond
a reasonable doubt, *and* the Commonwealth has failed
to exclude the reasonable possibility of a third person
committing the deed, then you would acquit the defend-
ant." (Emphasis supplied).

One must corrugate his brow and think hard to
grasp just what the judge meant by this involved
phraseology, but if one stays with it long enough he
will see that the judge was adding a condition to the
reasonable doubt doctrine which, of course, he had no
right to do at all. If anything in the criminal law of

America is definite, precise, inalienable, unalterable and as immovable as the Appalachian Mountains, it is that the defendant is absolutely entitled to an acquittal if the prosecution fails to prove its case beyond a reasonable doubt. But here the judge said that if the Commonwealth failed to carry its reasonable doubt burden, *that* failure would still not be enough to acquit the defendant. Something else had to be established, namely, the failure "to exclude the reasonable possibility of a third person committing the deed"? What is the meaning of these words? If they seem more like the expression of a clairvoyant seeking to impress by being occult than a judicial instruction, they would be treated as mere surplusage. But, nebulous as they may be, and as unfathomable as they may seem, they still state too clearly that the defendant is to be penalized if the Commonwealth fails to do certain unknown things. Of course, such a situation is intolerable in the criminal law.

Once the Commonwealth fails to prove its case beyond a reasonable doubt that ends the trial and a verdict of acquittal is mandatory, either by the jury's voluntary act or at the direction of the judge.

The judge seems to reveal his innermost thoughts on the case when he says in his opinion refusing a new trial: "We consider the charge just and fair, *considering that the defendant did not take the witness stand and deny any of the Commonwealth's evidence,* but was content to rest on the alleged weakness of the Commonwealth's circumstantial evidence." (Emphasis supplied). But whether the defendant did or did not take the stand, she was entitled to a charge which safeguarded all her constitutional prerogatives and did not impose on her unconstitutional conditions.

The difficulty I find in affirming the verdict in this case is that we are not sure that all avenues of possible acquittal were intellectually open to the jury. The rec-

ord would seem to suggest that the judge was so fearful that the defendant might be freed that, consciously or unconsciously, he continued throwing barriers across roads which could lead to acquittal.

Of course, it would be inevitable that the judge would come to a conclusion on his part as to whether the defendant was guilty or innocent, but he had the bounden obligation to keep that conclusion locked in his heart. Instead of doing so, however, he opened the strongbox of his heart and the secret flew out, to fly about the courtroom and eventually come to perch on the jury box rail itself. And while there, it spoke persuadingly to the jury, explaining that if there existed "a reasonable doubt of the defendant's guilt, then the law is that the defendant *should* be given the benefit of that doubt and *acquitted*," but that if the evidence convinced them of the defendant's guilt, they had a *"solemn duty"* to *convict*.

Of course, it may be that the judge was merely unfortunate in choosing wrong words to convey right ideas, but the jurors, like school children eager to learn the day's lesson, take each word pronounced by the teacher as grave and irrevocable judgment.

In outlining the evidence the judge said: "There was some evidence that the defendant told Officer Mould when he came to the front door of the Kravitz residence on July 4th, that she said 'everything is all right.' That she told Captain Shaffer, and the district attorney in questioning her, after this offense, that she had used, as a route to go from her home to the Passon residence, the Sussex and Morris Avenue route."

What was the "offense" the judge referred to? Did he characterize Mrs. Kravitz' statement that "everything was all right" as an offense, or was he referring to the killing itself? If he was referring to the killing, why did he incorporate it into the midst of a state-

ment as to the route taken by Mrs. Kravitz? If she was innocent, she had committed no offense.

In speaking of the Commonwealth's contentions the judge said to the jury: "The Commonwealth contends that there ewre no signs of any breaking or burglary at that time, between 5 p.m., when the house was again examined; that all doors and windows in this home were secure; that there was nothing missing from the house; that the jewelry, wallet on the bureau, and the money were all intact within the home; that this defendant made an unexpected visit to her brother-in-law's house, Morris Passon; that she talked on that occasion of the broken glass, and when there she telephoned to ascertain whether her husband had gone swimming or was in the home; that she requested Morris Passon to come to their home for some small gift, so that he could be there when the body was found."

It will be noted that here the judge enumerated many items of tangible and demonstrable events, all established by testimony, and then introduced as something proved what was merely argument on the part of the Commonwealth. The judge said that Mrs. Kravitz "requested Morris Passon to come to their home for some small gift, so that he could be there when the body was found." This, of course, sounds as if Mrs. Kravitz had told Mr. Passon that she wanted him to be at the Kravitz house when the body was to be found. Of course, Mrs. Kravitz said no such thing. She went to the Passon home, as I have already mentioned, to deliver flower pots and asked Mr. Passon to accompany her home so that she could give him some agricultural implements. When they arrived at the house, the dead body was discovered. This discovery had nothing to do with the visit to the Passons, so far as established evidence is concerned.

The excerpts which I have taken from the judge's charge, all revealing a Commonwealth flavor, may not

have been intended in that way by the speaker, but the jury can only be guided by what the judge says. The judge who is charging a jury is like the navigator in the control tower who is guiding an airplane into the airport through a dense fog. If the navigator speaks the wrong words, the airplane crashes.

It is very possible that the jury was reluctant to convict on the evidence as they heard it during the trial, but that when it came to them through the medium of the judge it took on nuances and colorations which made it sound like something far more convincing than it really was—and a verdict of guilty followed. Even so, it will be noted that there were some doubts in the minds of the jurors. Otherwise, they would not have returned a verdict of second degree murder with a recommendation of mercy.

If Mrs. Kravitz committed the heinous and brutal crime the Commonwealth charged her with, it is difficult to believe that any jury sworn to enforce the law as written could have found any reason to render a verdict of second degree murder, instead of first degree murder.

I regret having to make the following observation because the trial judge is certainly a jurist of ability and integrity, but the record, as I read it, demonstrates that he allowed his emotions to control his judgment, his feelings to guide his rulings, and his inner convictions to dictate his language of instruction to the jury. It would almost appear that he concluded that whatever assistance he could give the Commonwealth would be all for the good. He thus supplied the lightning of his authority to the thunder of the district attorney and, in doing so, the jury returned a verdict which could have been right, insofar as the facts are known to God, and then, again, by the same Omniscience, could have been entirely wrong.

Since we are only mortals and can only form our judgment on what is revealed to us, we cannot say with that assurance which should be ours in a matter so serious as a murder trial that the verdict in this case was uninfluenced by the errors which all those who run may read.

For that reason I believe there should be a new trial where the facts will speak trumpet-tongued, where prejudicial irrelevancies will be barred from the courtroom as effectually as a mob, where the scales of probity will be held uprightly, unswayed by the gales of passion which invariably accompany the discovery of deeds which shame mankind, and where the words of the judge will enlighten the jury as a living flame of impartiality and rectitude.

Such a trial, governed by the eternal principles of fairness and right which are a hallowed part of the great heritage of the democratic institutions of America, will take place in a calm and dispassionate atmosphere, and when the trial will have been concluded, the community will have reason to say that no one was denied due process and that the verdict, whatever it may be, will reflect truth and the sacred principles of eternal justice.