**In re Ethel KRAVITZ.**

**No. H.C. 635.**

United States District Court,
M. D. Pennsylvania.

May 12, 1980.

Harold Cramer, Philadelphia, Pa., for petitioner.

Ronald T. Williamson, Asst. Dist. Atty., Norristown, Pa., for respondent.

## MEMORANDUM

NEALON, Chief Judge.

Petitioner Ethel Kravitz was found guilty of the murder of her husband by a jury in Montgomery County, Pennsylvania in 1958. She sought to overturn that conviction through various judicial and extra-judicial proceedings for more than twenty-one years. On January 17, 1980, after evidentiary hearings into the substantive merits of her claims had been concluded, but before the legal issues could be presented for resolution, Mrs. Kravitz passed away.[1]

Death terminates Mrs. Kravitz's long, personal quest for vindication. Her attorneys argue, however, that death does not end the instant habeas corpus action. They assert that petitioner's tarnished reputation and the operation of the Pennsylvania Slayer's Act, 20 Pa.Const.Stat.Ann. §§ 8801 et seq. (Purdon) (1975), which precludes petitioner's estate from inheriting through her murdered husband's estate, are "collateral

---

1. Hearings inquiring into the validity of petitioner's conviction were conducted on August 20–22, 1979, and October 26, 1979. The final transcript of these hearings was filed on November 5, 1979. Petitioner's memorandum and proposed findings of fact were filed on December 3, 1979. After two time extensions, to which petitioner's counsel acquiesced, respondent's reply memorandum and proposed findings of additional facts were filed on the day petitioner died. The briefing schedule established by the court contemplated a response from petitioner and allotted ten days from the filing of respondent's brief and proposed findings of fact. Thus, this matter would not have been ripe for disposition until January 28, 1980. (January 27 was a Sunday.)

legal consequences" that save her habeas corpus petition from landing "ignominiously in the limbo of mootness." *Parker v. Ellis*, 362 U.S. 574, 577, 80 S.Ct. 909, 911, 4 L.Ed.2d 963 (1960) (Warren, C. J., dissenting).

■ After careful consideration, I must disagree. Neither the stigma of a murder conviction nor the pecuniary loss to her estate invest the deceased habeas applicant's collateral challenge to the validity of the 1958 conviction with the "live controversy" necessary to sustain this court's limited subject-matter jurisdiction. Accordingly, the petition for a writ of habeas corpus will be dismissed as moot.

### I.

Pervading petitioner's efforts to reverse her 1958 murder conviction has been her strong desire to secure a declaration of her innocence; her interest in litigating the constitutionality of that conviction seems to have been only secondary. Indeed, Mrs. Kravitz has placed the finger on the man she claims actually killed her husband. She asserts that only some strange duress or compulsion exerted over her by the alleged perpetrator prevented her from divulging his identity at the time of the criminal investigation. During the hearings conducted in this case, however, Mrs. Kravitz, under oath, named her slain husband's brother-in-law, Morris Passon, as the real murderer. Passon, also under oath, vehemently denied the accusation.

This sensational charge and Passon's cryptic involvement in the whole affair fuel the intrigue that surrounds this celebrated and highly publicized case.[2] But the mystery and sensationalism interjected throughout the proceedings must not obscure the fact that the federal habeas court's role is limited to ascertaining the constitutionality of a conviction, not its correctness.[3] Nor can the merits or demerits of petitioner's claims distract this court's consideration of the mootness issue. To put this matter in proper perspective, it is perhaps best to briefly relate the factual predicate for the constitutional issue presently before this court, and chronicle the procedural background of this protracted litigation.[4]

2. Passon was present with petitioner when she allegedly "discovered" her husband's dead body, and he summoned the police to her house. He later testified as a prosecution witness at petitioner's criminal trial. After petitioner's accusation received some publicity, Passon instituted defamation actions against petitioner and her attorneys.

Petitioner's story is that Passon had forced her to engage in sexual acts with him while her husband was in the military service. Petitioner says she did not tell her husband of Passon's conduct until shortly before July 4, 1958. Passon purportedly feared that petitioner's husband would use this information to ruin Passon, and so, petitioner alleges, he killed him and placed the blame on her.

3. Sokol notes: "The guilt or innocence of the petitioner is also not brought into question by habeas corpus. Of course it is altogether possible that a man can be innocent and still be legally detained. For 'the denial of a fair hearing is not established by proving merely that the decision was wrong....' " R. Sokol, Federal Habeas Corpus § 2 (2d ed. 1969).

4. The following is the specific claim asserted in the initial petition filed in this court on March 15, 1965 and now pending:

The testimony of Detective Moody that he had a long conversation with the petitioner in the police fingerprint room late the night of the murder (when she was not represented by counsel) violated the petitioner's right to be protected from compulsory self-incrimination. He did not testify that he warned her of her rights against self-incrimination. This violation of her constitutional rights was compounded by the Trial Judge who, instead of instructing the jury about the impropriety of such testimony, commented upon it as though it, in fact, was the testimony of the petitioner.

The other issues initially raised by petitioner were disposed of on their merits by the late Judge Follmer, and his decision was affirmed by our Court of Appeals. *See In re Kravitz*, 358 F.2d 734 (3d Cir. 1966) (*per curiam*).

Prior to the hearings conducted in this case in August and October of 1979, petitioner moved to amend the 1965 habeas corpus application to include a claim of juror prejudice. Petitioner also moved to reconsider the decision of the late Judge Follmer that the repetitive and erroneous references by the trial judge to petitioner's refusal to take a blood test were harmless error. Following the hearings conducted in this case, petitioner moved to amend her 1965 petition to include claims that peti-

## II.

Petitioner's husband was found dead in the marital bedroom of their home in Wynnewood, Pennsylvania, late in the afternoon of Independence Day, 1958. He had been shot several times and had been bludgeoned about the head and face. There were apparently no witnesses to the brutal slaying, but certain circumstantial evidence tended to inculpate petitioner and suspicion focused on her almost immediately.[5] Less than an hour after the police arrived at the Kravitz home, Captain Shaefer, in the presence of several other Lower Merion Township police officers, questioned petitioner concerning the murder.[6] During this interrogation, petitioner appeared distraught, and answered Captain Shaefer's questions hesitantly. Approximately forty-five minutes after the interrogation began, petitioner's pulse and blood pressure were checked by Dr. Shoemaker. Captain Shaefer resumed questioning petitioner twenty minutes later, but this interrogation lasted for only five minutes.

■ At approximately 9:30 that night, petitioner was taken to the Lower Merion Township police station for further questioning. Montgomery County Chief Detective Charles G. Moody interrogated petitioner at the police headquarters for about two hours, from 10:30 P.M. to 12:30 A.M. Between 1:00 and 1:30 A.M. petitioner was advised that she was being charged with the murder of her husband. Petitioner was then questioned by District Attorney Bernard DiJoseph from 2:00 to 2:30 A.M. Following this interrogation, which was tape-recorded, petitioner was asked a few questions by Detectives Tammany and Waller concerning certain blood-splattered apparel. At no time during any of these interrogations was petitioner advised of her right to remain silent or of her right to assistance of counsel.[7]

At the murder trial, law enforcement officers testified that petitioner had admitted wearing on the day of the homicide blood-splattered clothing found in the bedroom where petitioner's husband was slain.[8] Also during the trial, Detective Moody testified that petitioner had made contradictory statements regarding the route she had taken to the home of her husband's brother-in-

---

tioner was denied her right to a fair trial by virtue of alleged "inaccurate testimony severely questioning the credibility of [certain] witnesses," and by virtue of an alleged "suppression by the Commonwealth of evidence contradictory to that offered at her trial and material to the issue of petitioner's innocence. . . ."

5. For a review of the significant circumstantial evidence introduced at the murder trial see *Commonwealth v. Kravitz*, 400 Pa. 198, 200–16, 161 A.2d 861 (1960), *cert. denied*, 365 U.S. 846, 81 S.Ct. 807, 5 L.Ed.2d 811 (1961).

6. The factual recitation presented here is limited to matters on which there is general agreement. There is a sharp split between petitioner's and the Commonwealth witnesses' version of what transpired during the night of July 4, and early morning hours of July 5, 1958. Petitioner testified that she was questioned almost continually by relays of law enforcement officials from approximately 5 P.M. until daylight the following morning. She also related that she had been physically abused and humiliated, and forced to urinate in the presence of a police officer. She further stated that she was exhausted and fainted during the interrogation on that hot summer night, and that she was denied food and water. The Commonwealth witnesses denied these lurid claims of abuse and physi-

cal indignities, averring that questioning of petitioner was intermittent, not conducted by batteries of officers, and that petitioner's physical condition did not evidence exhaustion, fatigue or shock. There are also other credibility issues concerning petitioner's purported refusal to submit to a blood test and her failure to tell her attorney about the manner in which she was interrogated. This memorandum disavows any inference that credence has been given to one side's story, and leaves the specific factual disputes unresolved.

7. Petitioner's conviction ante-dated *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and the issue here is whether the incriminating statements were the product of police coercion. The failure to apprise petitioner of her Fifth and Sixth Amendment rights is a factor to be taken into account under the "totality of the circumstances" test for determining the voluntariness of incriminatory statements, *but is not alone dispositive*.

8. Detectives Tammany and Waller testified at petitioner's murder trial that she had acknowledged wearing the clothes identified at the police station during the early morning hours of July 5, 1958. (Trial N.T. 1201–02).

law, Morris Passon, on the day of the murder.[9] The alleged murder weapon was found in a culvert along Morris Road, one of the routes Detective Moody said that petitioner admitted taking to the Passon home on the day of the murder.[10]

No objections to the admissibility of her incriminatory statements were ever made at trial.[11] Nor does it appear that the voluntariness of these statements was questioned in her post-trial motions and direct

appeal to the Pennsylvania Supreme Court. It seems that this issue was first raised when petitioner instituted the instant habeas corpus action in 1965.[12] While the admission of the challenged statements caused our Court of Appeals some concern, it affirmed Judge Follmer's dismissal of this claim on the ground that the Pennsylvania Post Conviction Hearing Act[13] seemed to offer a state judicial forum for its adjudication.[14] *See In re Kravitz*, 358 F.2d 734, 735 (3d Cir. 1966) (*per curiam*).

**9.** At the habeas corpus hearing, conducted in this case two separate typescripts of Moody's interrogation, both apparently prepared by Moody, were produced. The one typescript, identified as P–6, did not contain anything about the route petitioner had taken to Passon's home. The other, marked as R–17, contained the incriminatory contradictory statements. At the October hearing, Moody attempted to explain the confusion surrounding the existence of the two typescripts of his interrogation of petitioner. (Notes of Testimony of October Habeas Corpus Hearing 70–75 (Oct. H.C.N.T. 70–75)).

**10.** Detective Moody gave the following testimony at petitioner's trial concerning his interrogation of petitioner:

She said: "I was going to take [flower pots] to my brother-in-law because he just built a new greenhouse." And I said, "Did you take those flower pots to your brother-in-law?"

She said, "Yes."

I said, "What route did you use?"

She said, "Morris Road." She said, "No, Haverford Avenue." She said: "There are three or four ways to go there."

I said, "Tell me all the routes you can use to go to your brother-in-law's house."

She said: "Well, I used Haverford Avenue."

(Trial N.T. 1188–1189). Moody also testified that petitioner had told him she had worn brown shorts and a reddish-gray shirt on the day of the murder, a description that matches the blood-splattered clothing found in the room where her husband was killed.

The Pennsylvania Supreme Court remarked that the contradictory statements attributed to petitioner concerning the route she had taken to Passon's home "indicated an attempt to deceive the police and conceal her guilt." *Commonwealth v. Kravitz*, 400 Pa. at 207, 161 A.2d 861. The court also noted the significance of the appearance of blood on clothing petitioner admitted wearing that day.

**11.** Pennsylvania's procedure at the time of petitioner's trial for determining the voluntariness of inculpatory statements was similar to that

proscribed in *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Under that procedure, unless a confession was clearly coerced the question of voluntariness was submitted to the jury that determined the accused's guilt or innocence. Petitioner's trial attorney, William O'Hey, testified that he believed that raising the voluntariness issue before the same jury that determined guilt or innocence would be prejudicial. (Notes of Testimony, August Habeas Corpus Hearing 119 (Aug. H.C.N.T. 119)) He also related that Moody's testimony corroborated the story told by petitioner to him, and that he believed the trial judge's charge, which attributed the inconsistency to petitioner, made Moody's testimony appear more damaging. (*Id.* at 127) It should also be noted that petitioner apparently did not tell O'Hey that she had been slapped or humiliated by law enforcement officials. (*Id.* at 134).

**12.** Petitioner had previously filed a claim to her husband's residuary estate, and, to overcome the bar of the Pennsylvania Slayer's Act, she offered to testify that she was innocent of her husband's murder and to support her claim of innocence by the testimony of additional witnesses. Her claim to her husband's residuary estate was disallowed on the ground that a murder conviction precludes re-litigation of the issue of guilt or innocence under the Slayer's Act. *See Kravitz Estate*, 418 Pa. 319, 211 A.2d 443 (1965).

**13.** Pa.Stat.Ann. tit. 19, §§ 1180–1 *et seq.* (Purdon) (Supp.1980) [hereinafter referred to as the PCHA].

**14.** The Court of Appeals noted that petitioner's remaining claims were "clearly without merit." *In re Kravitz*, 358 F.2d at 735. Those claims concerned:

1. The actions of the trial judge and the District Attorney at petitioner's trial relating to the alleged but unproved refusal to take a blood test.
2. Participation of a tipstaff in jury deliberations.
3. Prejudicial influence of newspaper and radio publicity.

Petitioner's subsequent bid to seek state judicial review of the voluntariness of the incriminating statements was rejected without a hearing on the ground that she had "waived" this claim under section 4 of the PCHA. *See Commonwealth v. Kravitz*, 441 Pa. 79, 85, 269 A.2d 912 (1970). Petitioner then sought an executive pardon, but this avenue also proved unsuccessful.

In September 1975, petitioner instituted an action in the United States District Court for the Eastern District of Pennsylvania, seeking a declaratory judgment pursuant to 28 U.S.C. § 2201 that her conviction was "null and void." This lawsuit was dismissed without opinion.

Also in September 1975, petitioner filed in the Eastern District of Pennsylvania an application for a writ of habeas corpus. By this time petitioner had been released from prison and discharged from parole, and the habeas corpus action was dismissed for want of subject matter jurisdiction inasmuch as petitioner had not been "in custody" at the time the petition was filed, as required under 28 U.S.C. § 2254.

The Court of Appeals for the Third Circuit affirmed both dismissals. *Kravitz v. Commonwealth*, 546 F.2d 1100 (3rd Cir. 1977). Circuit Judge Gibbons dissented from the dismissal of the habeas corpus action, opining that jurisdiction over petitioner's Fifth Amendment claim was satisfied by relation back to the 1965 petition filed in this court. Judge Gibbons then suggested using Rule 60 of the Federal Rules of Civil Procedure to reopen the 1965 habeas corpus proceeding, and thereby obtain a federal determination of the constitutionality of her conviction.

On May 4, 1977, petitioner filed a motion pursuant to Rule 60 "to obtain a clarification or modification of the Court's Order . . . denying the . . . petition . . . ." Specifically, petitioner sought to add to Judge Follmer's Order of August 25, 1965 "express language retaining jurisdiction pending determination by the state courts of the constitutional issues presented to, but undecided by, this Court. . . ." This motion was denied by Order dated June 16, 1977, with leave to file a second motion that conformed to the requirements of Rule 60(b).

Petitioner subsequently filed a motion under Rule 60(b)(6),[15] which was granted by Order dated November 2, 1977. Respondent then moved to dismiss the petition for lack of jurisdiction on the grounds that petitioner was no longer in custody and Rule 60(b) relief was time-barred. By Order dated August 2, 1978, respondent's motion was denied. The August 2nd Order also vacated the Order of November 2, 1977 reopening this case, and scheduled a hearing on the question of the reasonableness for the delay in filing the Rule 60 motion. After reviewing the testimony offered at this hearing I concluded that the delay was not unreasonable and granted petitioner's motion for relief from judgment. *See In re Kravitz*, 471 F.Supp. 665 (M.D.Pa.1979).

While petitioner's Rule 60(b) motion was still pending, respondent moved to dismiss the habeas corpus petition on the ground of waiver.[16] By Memorandum and Order dated June 5, 1979, 488 F.Supp. 38, I held that the 1970 state court waiver ruling was not conclusive in this federal habeas corpus proceeding and that an evidentiary hearing would be necessary to resolve the matter. In recognition of the likelihood that wit-

---

4. The court's failure to charge that the jury verdict must be unanimous.
5. The charge of the court with relation to the matter of reasonable doubt.
6. The general unfairness of the trial.

**15.** Rule 60(b)(6) provides, in pertinent part, as follows:

On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:

. . . (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time. . . .

**16.** The concept of "waiver" in the context of habeas corpus actions under 28 U.S.C. § 2254 recognizes that in a federal system such as ours the procedural regimes of the state courts must be accorded due respect. Thus, in appropriate circumstances, non-compliance with a state procedural requirement will foreclose or "waive" federal collateral review.

nesses would become unavailable with the passage of additional time, and in an effort to efficiently employ judicial resources, the federal "waiver" hearing was combined with a hearing on the merits of petitioner's voluntariness claim.

These hearings were conducted August 20–22, 1979, and October 26, 1979. Following the October 26th hearing a schedule was established for presentation of proposed findings of fact and legal memoranda. Before this agenda was completed petitioner passed away.

### III.

"Mootness" is one aspect of the "justiciability" doctrine, which "prohibits consideration of constitutional issues except as a necessary incident to the resolution of a concrete 'case' or 'controversy.' This doctrine limits the jurisdiction of federal courts; when its requirements are not satisfied courts are without power to proceed, regardless of the wishes of the parties." [17] Brilmayer, *The Jurisprudence of Article III: Perspectives on the "Case or Controversy" Requirement*, 93 Harv.L.Rev. 297, 297–98 (1979). Justiciability, however, is not an immutable concept. Note, *The Mootness Doctrine in the Supreme Court*, 88 Harv.L.Rev. 373, 377 (1974). Instead, it has been characterized as "flexible," recognizing exceptions based upon "practicalities and prudential considerations." *United States Parole Commission v. Geraghty*, 445 U.S. 388, 404, n.11, 100 S.Ct. 1202, 1212, n.11, 63 L.Ed.2d 479 (1980). In *Geraghty*, the Supreme Court explained the inter-relationship between the "case or controversy" requirement and the mootness doctrine:

Article III of the Constitution limits federal 'judicial Power', that is, federal court jurisdiction, to 'Cases' and 'Controversies'. This case or controversy limitation serves two complementary purposes. It limits the business of federal courts to 'questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process,' and it defines the 'role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of the government.' Likewise, mootness has two aspects: 'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'

*Id.* at 395, 100 S.Ct. at 1208. (citations omitted).

Consideration of the dual aspects of the mootness doctrine with a view toward the function and purpose of the writ of habeas corpus militates against finding a justiciable "case or controversy" here. The function of the writ "is to test in a court of law the legality of restraints on a person's liberty." R. Sokol, Federal Habeas Corpus § 1 (2d ed. 1969). A criminal conviction resulting in a prison sentence generally imposes restraints on a person's liberty beyond an actual loss of freedom, and so long as these "collateral legal consequences" subsist a challenge to the validity of the conviction, either on direct appeal or collaterally, remains "live." [18] *See, e. g., Pennsylvania v. Mimms*, 434 U.S. 106, 108, n.3, 98 S.Ct. 330, 332, n.3, 54 L.Ed.2d 331 (1977) (*per curiam*); *Sibron v. New York*, 392 U.S. 40, 55–58, 88 S.Ct. 1889, 1898, 20 L.Ed.2d 917 (1968); *Carafas v. LaVallee*, 391 U.S. 234, 237, 88 S.Ct.

---

**17.** Mootness "was initially grounded in the common-law doctrine that courts lacked power to decide abstract questions in cases where no dispute exists," and its connection to the case or controversy requirement of Article III was only recently recognized. Note, *The Mootness Doctrine in the Supreme Court*, 88 Harv.L.Rev. 373, 374–75 (1974).

**18.** The following have been identified as possible collateral legal consequences attending a criminal judgment: inability to engage in certain businesses; disqualification to serve as a labor union official; disqualification as a juror; disenfranchisement; professional disciplinary proceedings; loss of the right to hold federal or state office; and use of the conviction to impeach credibility. The collateral legal consequences rule has generally been applied where the prison sentence has been completely served. Only in *United States ex rel. Schwartz v. Lennox*, 320 F.Supp. 754 (E.D.Pa.1971), is there an intimation that the rule applies where the convicted person dies. *See* discussion *infra*.

**50**

1556, 1559, 20 L.Ed.2d 554 (1968); *Jessup v. Clark*, 490 F.2d 1068 (3d Cir. 1973). *See generally* Note, *The Mootness Doctrine in the Supreme Court*, 88 Harv.L.Rev. 373, 380–83 (1974). But when the criminal judgment no longer affects the convicted person's legal rights, the challenge to the constitutionality of the conviction does not present a "case or controversy." *See, e. g., North Carolina v. Rice*, 404 U.S. 244, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971); *United States v. Bohling*, 399 F.2d 305 (6th Cir. 1968). That is, the removal of the collateral legal consequences precludes the court from entering a decree that affects an individual in a concrete case.

■ Since death has removed the vestigial remnants of petitioner's conviction, i. e., there are no longer restraints on her liberty resulting from her conviction, the controversy is no longer "live." In sum, petitioner's actual, concrete injury suffered as a result of the putatively unconstitutional conviction continued up until the time of her death, but not beyond. The abstract question of whether petitioner's constitutional rights have been violated does not sustain federal jurisdiction.

■ Petitioner's counsel argues, however, that the moral stigma attaching to a murder conviction and the inability of petitioner's estate to inherit through her husband's estate are subsisting collateral legal consequences that save this case from the bar of mootness. Petitioner's claim that reputation alone sustains federal court jurisdiction is not supported by the case law. The Supreme Court "has never mentioned the moral stigma of a criminal conviction as a collateral consequence justifying the continuing exercise of jurisdiction." [19] Note, *The Mootness Doctrine in the Supreme Court*, 88 Harv.L.Rev. 373, 381, n.38 (1974). Furthermore, the Court of Appeals for this circuit, relying on *St. Pierre v. United States*, 319 U.S. 41, 43, 63 S.Ct. 910, 911, 87 L.Ed. 1199 (1943), has ruled that the moral stigma attending a conviction does *not* satisfy Article III jurisdictional requirements. *See Government of the Virgin Islands v. Ferrer*, 275 F.2d 497, 499 (3d Cir. 1960). *Accord, United States v. Galante*, 298 F.2d 72, 73 (2d Cir. 1962). Simply stated, the interest in posthumously restoring petitioner's reputation is not sufficient to present a "case or controversy" for judicial resolution.[20]

■ Nor do I believe that the operation of the Pennsylvania Slayer's Act defeats mootness.[21] As Judge Lord observed in *United States ex rel. Schwartz v. Lennox*, 320 F.Supp. 754, 756 (E.D.Pa.1971):

[I]t would be a prostitution of the Great Writ, historically dedicated to the vindication of personal rights, to permit it to be used by beneficiaries, whose constitutional rights are not in question, as a device to obtain money.

**19.** Pennsylvania applies the collateral consequences rule to PCHA challenges to the validity of a conviction where the petitioner has completed his sentence, but Pennsylvania has declined to follow the view that the petitioner's interest in clearing his name, *per se*, permits review or attack upon the conviction. *See Commonwealth v. Doria*, 468 Pa. 534, 364 A.2d 322 (1976).

**20.** In *United States v. Schrimsher*, 493 F.2d 842, 844 (5th Cir. 1974), the court noted the adverse effect on a person's *professional* reputation as a possible collateral consequence defeating mootness. The Court of Appeals for the Fifth Circuit did not purport to rule that interest in one's *personal* reputation is sufficient to invest a criminal appeal with a "live" controversy. Petitioner's lawyers have not cited and my independent research has not disclosed any federal decision holding that reputation alone sustains a challenge to a criminal conviction.

**21.** Petitioner's murder conviction precludes relitigation of her guilt or innocence for purposes of sharing in her husband's estate, *see* n.11 *supra*, but a finding that her conviction is unconstitutional would not automatically enable her estate to inherit through her husband's estate. Although the Pennsylvania Supreme Court has not decided the issue, *see In re Estate of Klein*, 474 Pa. 416, 425, 378 A.2d 1182 (1977), it would appear that a reversal would simply allow the issue of petitioner's guilt or innocence to be re-litigated in the Orphan's Court. *Cf. Prudential Insurance Company of America v. Doane*, 339 F.Supp. 1240, 1242 (E.D.Pa.1972) (an acquittal does not foreclose a challenge under the Pennsylvania Slayer's Act).

The simple fact is that we are in no position to restore any rights of personal freedom to [petitioner]. We cannot command the sheriff to release him for he is no longer in custody. We cannot restore his freedom to hold office, or his freedom to serve as a juror. In short, death, and not his conviction, has intervened to obliterate those freedoms for all time. Any favorable action by us would operate only to enhance the property rights of persons other than [petitioner]. Since no personal freedom rights of [petitioner] are any longer involved, his petition does not survive his death.

■ But even assuming that the effect of the Slayer's Act is a sufficient collateral legal consequence to make this controversy "live," the second aspect of the mootness doctrine—a personal stake in the outcome— is not satisfied here. The "personal stake" requirement, which is rooted in standing concepts, impacts on the first purpose of the justiciability doctrine—"limiting judicial power to disputes capable of judicial resolution." *United States Parole Commission v. Geraghty*, 445 U.S. at 395, 100 S.Ct. at 1208. "The imperatives of a dispute capable of judicial resolution are sharply presented issues in a concrete factual setting *and self-interested parties vigorously advocating opposing positions.*" *Id.* at 397, 100 S.Ct. 1210 (emphasis added).

■ At the present time there is no self-interested party vigorously seeking vindication of petitioner's constitutional rights.[22] Indeed, petitioner was the only person that had standing to collaterally attack the validity of her conviction. Neither the administrator of her estate nor its beneficiaries can sue to obtain a judgment that petitioner's constitutional rights have been violated.[23] Although these parties may have been injured by the conviction and the resulting preclusive effect of the Pennsylvania Slayer's Act, their interests in maximizing their inheritance is not arguably within the zone of interests protected by the constitutional guarantee involved here or the habeas corpus statute.[24] *See Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 152, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). *See generally* C. A. Wright, Handbook of the Law of Federal Courts, § 13 (3rd ed. 1976). Accordingly, the petition must be dismissed for want of a justiciable controversy.[25]

22. Counsel for petitioner has not substituted a party to represent petitioner's interests. It must also be noted that there is nothing in the record to indicate that petitioner died testate or has any surviving relatives who would be entitled to share in her estate under the New York or Pennsylvania intestate laws. (Petitioner was a New York resident when she died.)

23. Although 28 U.S.C. § 2242 permits "next of friend" habeas corpus applications, *see* R. Sokol, Federal Habeas Corpus § 5.1 (2d ed. 1969), it appears that the person on whose behalf the petition is filed must be personally affected by the habeas court's decision. No case has been found holding that the executor of an estate could pursue a habeas corpus petition for a deceased applicant.

24. The fact that under Pennsylvania law a damage action for libel does not abate upon the plaintiff's death, *see Moyer v. Phillips*, 462 Pa. 395, 341 A.2d 441 (1975), is of no import here. While petitioner's good name and reputation undoubtedly have intrinsic value, there is simply no party with the requisite standing to challenge her conviction.

25. Petitioner's attorneys refer to the federal rule that death pending an appeal from a conviction abates the entire proceeding, including the guilty verdict, *ab initio, see, e. g., United States v. Bechtel*, 547 F.2d 1379 (9th Cir. 1977) (per curiam), and the Pennsylvania rule that a decision on the merits will be rendered even though the appellant dies pending appeal, *see Commonwealth v. Walker*, 447 Pa. 146, 288 A.2d 741 (1972), as supporting a finding that petitioner's case has not mooted out. The federal rule, however, is premised on the *de facto* mootness of the matter and the unfairness of allowing a conviction to stand before the appellant has had the benefit of appellate review, which is an 'integral part of [our] system for finally adjudicating [his] guilt or innocence.'" *United States v. Moehlenkamp*, 557 F.2d 126, 128 (7th Cir. 1977). Thus, for example, the Supreme Court dismisses a petition for certiorari, which is discretionary, when the person challenging his federal conviction dies while the petition is pending. *See Dove v. United States*, 423 U.S. 325, 96 S.Ct. 579, 46 L.Ed.2d 531 (1976) (per curiam). The Pennsylvania rule also recognizes the unfairness of depriving a litigant of his right to appellate review, and, not being constrained by Article III limitations, allows the appeal to continue. Neither rule purports to hold that death does not moot the

The reported decisions that have addressed the issue have all concluded that death moots a habeas corpus action. *See Knapp v. Baker,* 509 F.2d 922 (5th Cir. 1975) *(per curiam); Goronto v. MacDougall,* 482 F.2d 361 (5th Cir. 1973) *(per curiam); United States ex rel. Lynch v. Fay,* 284 F.2d 301 (2d Cir. 1960) *(per curiam); Hann v. Hawk,* 205 F.2d 839 (8th Cir. 1953); *United States ex rel. Schwartz v. Lennox,* 320 F.Supp. 754 (E.D.Pa.1971).[26] In fact, counsel have not cited, and my research has not disclosed, any case holding to the contrary. In view of the above analysis, which clearly compels a finding of mootness, and the unanimity of the decisional authority, I am constrained to dismiss this action for want of subject matter jurisdiction.[27]

matter, and the federal rule, by implication, supports the decision reached here.

**26.** To the extent that the ruling in *United States ex rel. Schwartz v. Lennox, supra,* may suggest that an adverse impact on the petitioner's estate would save a habeas corpus action, I decline to follow it.

**27.** It should be noted that generally a writ of habeas corpus is issued conditionally, and the

state is given an opportunity to re-try the petitioner before the writ becomes absolute. *See, e. g., United States ex rel. Hickey v. Jeffes,* 571 F.2d 762, 766 (3rd Cir. 1978). *See generally* Wright, *Procedure for Habeas Corpus,* 77 F.R.D. 227, 247 (1978). Here, if this court were to find petitioner's conviction unconstitutional, the Commonwealth would be denied an opportunity to re-try petitioner.